[Nos. 68535-5; 69327-7. En Banc.]
Argued November 14, 2000. Decided September 13, 2001.

IGNACIO GUILLEN, *as Guardian*, ET AL., *Respondents*, v. PIERCE COUNTY, *Petitioner*.

ROBERT WHITMER, *Individually and as Guardian*, ET AL., *Respondents*, v. CHIN S. YUK, ET AL., *Petitioners*.

700

*Harold T. Dodge* and *Vernon W. Harkins* (of *Rush, Hannula, Harkins & Kyler*); *Timothy Malarchick*; *Thomas J. West* and *Philip Brennan* (of *Krilich, La Porte & West, P.S.*); *Gerald A. Horne*, Prosecuting Attorney for Pierce County, and *Daniel R. Hamilton* and *Susan P. Jensen*, Deputies; and *Jeffrey F. Hale* (of *Johnson, Graffe, Keay & Moniz*), for petitioners.

*Salvador A. Mungia* and *Darrell L. Cochren* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*), *Juliana K. Burnett*, and *David K. DeWolf*, for respondents Guillen.

*Richard H. Benedetti* (of *Davies Pearson, P.C.*), *Keith L. Kessler* and *Garth I. Jones* (of *Stritmatter Kessler Whalen Whithey & Coluccio*), and *Charles K. Wiggins* (of *Wiggins Law Offices, P.L.L.C.*) for respondents Whitmer.

*William L. Cameron* on behalf of Washington State Association of Municipal Attorneys, amicus curiae.

*E. Bronson Potter* on behalf of Washington Association of Prosecuting Attorneys, amicus curiae.

*Christine O. Gregoire, Attorney General*, and *William L. Williams* and *Michael E. Tardif, Senior Assistants*, on behalf of the State, amicus curiae.

*Debra L. Stephens, Bryan P. Harnetiaux*, and *Gary N. Bloom* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

BRIDGE, J. — The respondents in these consolidated cases seek access to accident reports and other materials and data held by the local government petitioners relating to the traffic history of the sites of their subject car accidents. Petitioners claim that all accident reports are nondiscoverable, since RCW 46.52.080 declares them "confidential" and inadmissible. Petitioners also contend that *all* the materials and data at issue are privileged under 23 U.S.C. § 409—and consequently also exempt from public disclosure under RCW 42.17.310(1)(j)—since they were, according to sworn declarations in the record, "compiled" or "collected" by petitioners pursuant to 23 U.S.C. § 152 so as "to identify hazardous locations, sections, and elements" on "all public roads" that might prove to be good candidates for federally funded safety enhancement projects. Petitioners note that 23 U.S.C. § 409 was expressly amended by Congress in 1995 to cover all "reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to §§ 130, 144, and 152 of this title." We reject both arguments.

While RCW 46.52.080 exempts accident reports prepared by persons involved in accidents from public disclosure or admission as evidence in certain trials, we hold that they remain discoverable. Furthermore, we hold that Congress' 1995 amendment to 23 U.S.C. § 409 violates the United States Constitution's federalist design as defined by its framers and by the United States Supreme Court, insofar as it makes state and local traffic and accident materials and data nondiscoverable and inadmissible in state and local courts, simply because they are *also* "collected" and used for federal purposes. We hold that only materials and data originally *created* for the statutorily identified federal

purposes are lawfully covered by the federal privilege and, thus, exempt from public disclosure under RCW 42.17-.310(1)(j). Because there are insufficient facts in the record to apply this standard to all of the disputed items in these consolidated cases, we vacate the lower courts' rulings and remand for supplementation of the record and further proceedings not inconsistent with this opinion.

## FACTS

### *Guillen*

On July 5, 1996, Ignacio Guillen's wife, Clementina Guillen-Alejandre, was killed and her passengers injured in an automobile collision at the intersection of 168th Street East and B Street East, in Pierce County. Months earlier, on May 11, 1995, based on traffic and accident reports and data in its possession, Pierce County had identified this intersection as especially hazardous and applied for federal hazard elimination funds under 23 U.S.C. § 152. That application was denied. The County then reapplied on April 3, 1996, and on July 26, 1996, three weeks *after* Guillen-Alejandre's fatal accident, the application was granted.

A letter dated August 16, 1996, was sent on Guillen's behalf to the County's Risk Management Department, requesting materials and data relating to the intersection's accident history. The county prosecuting attorney's office denied the request in a letter dated September 9, 1996, claiming the history was privileged under 23 U.S.C. § 409 and RCW 42.17.310(1)(j). In a letter dated October 28, 1996, counsel for Guillen clarified his request: "I want to make the record clear that we are not seeking any reports that were specifically written for developing any safety construction improvement project at the intersection at issue." Clerk's Papers (CP) at 93.

> However, on behalf of our clients, we are seeking a copy of all documents that record the accident history of the intersection that may have been used in the preparation of any such

reports. In other words, we are simply seeking information as to when accidents have occurred at the intersection for the last ten years. This would include any documents that record (1) the date of any such accidents, (2) the parties involved at each such accident, (3) the date of each such accident [sic], (4) fatalities, if any, at each such accident, (5) the identification of all known accidents [sic] at each such accident, (6) copies of photographs taken at each such accident, (7) the configuration of the intersection (what traffic signs existed) at the time of each such intersection [sic], and (8) documents recording traffic counts at the intersection.

Obviously, the documents we are requesting would not contain any opinions by Pierce County representatives as to the safety of the intersection. Instead, we are seeking documents pertaining to facts.

*Id.* at 93-94. In a letter dated November 12, 1996, the County reiterated its refusal to release any of the requested materials or factual data relating to the intersection other than a simple traffic count, claiming that these were privileged under 23 U.S.C. § 409, since they represented "data the County has compiled for the sole purpose of identifying[,] evaluating or planning the safety enhancement of potential accident sites, hazardous roadway conditions or for developing highway safety construction improvement projects" pursuant to § 152. CP at 96.

A. <u>Public Disclosure Request:</u> On December 9, 1996, Guillen challenged that denial of access in Pierce County Superior Court in a complaint filed under RCW 42.17.340 of the public disclosure act (PDA). The County moved for summary judgment under 23 U.S.C. § 409 and RCW 42-.17.310(1)(j). Guillen filed a cross-motion for summary judgment. The trial court denied the County's motion, but granted Guillen's cross-motion, ordering the County to pay attorney fees under RCW 42.17.340(4) and to disclose the following materials:

1. Motor vehicle traffic accidents by location—County of Pierce—prepared by Records Section, Washington State Patrol [WSP], 1/90 - 6/30/96

. . . .

10. Collision diagram dated 1/5/89 prepared by Georgia Fischer.

11. Collision diagram dated 7/18/88 prepared by Georgia Fischer.

. . . .

13. Police Traffic Collision Reports and Motor Vehicle Reports from 1/1/90 prepared by [various] law enforcement agencies.

. . . .

15. Draft letter to Barbara Gelman from Frederick L. Anderson with note to file signed by Jim Ellison on 3/6/89.

CP at 20-21.[1] The County sought appellate review of the trial court's PDA ruling.[2]

---

[1] Thomas Ballard, the County Engineer, described these items in greater detail as follows:

5. Two of the documents at issue are items 1 and 13. Item no. 13 is a collection of the accident reports for the subject intersection from 1990 through 1996. Item no. 1 is a list of those same accidents showing the location, time, date and nature of the accident. A study of the accidents at the intersection was a crucial element in the County's review of the operation and safety of the intersection. The County collected those accident reports solely for that purpose. The decision to apply for Section 152 funds was based in large part on those accident reports. The nature of the accidents, as identified in those reports, was a critical determining factor in the County's design of the safety improvement for which application was made. The WSDOT [Washington State Dep't of Transp.] requires the County to fill out a prospectus to apply for Section 152 funds. . . . The prospectus specifically requires an accident history. If the County did not collect and analyze the accident reports, it would not be possible to plan and implement the safety improvements and it would be impossible to apply for and receive Section 152 funds.

6. Items 10 and 11 are collision diagrams . . . used to consider whether the design of the intersection was a causative factor in the accidents and what, if any, design improvements could be made to increase safety and lessen the possibility of future accidents. . . . The Section 152 application specifically requires an explanation and design of the proposed improvement. Items 10 and 11 . . . were compiled and used specifically for the purpose of determining the need for and designing the signalization improvement that was the basis of the Section 152 application and that was ultimately installed at the intersection.

CP at 54-55 (Third Decl. of Thomas G. Ballard, P.E., County Engineer).

2. Item 15 . . . is the draft of a memorandum from Fred Anderson, then Public Works Director, to Barbara Gelman, then County Council member. It consists of information used for the County's application for federal funds for safety enhancement at the intersection of 168th Street East and B Street East.

CP at 39 (Suppl. Decl. of Thomas G. Ballard, P.E., County Engineer).

[2] Initially, Pierce County had also refused to disclose "communication[s] to the County regarding a perceived problem at the intersection," but later "determined

**B. Civil Discovery Request:** While that appeal was still pending, Guillen filed a separate tort action in Pierce County Superior Court, claiming that the County's failure to install proper traffic controls at the intersection was a negligent proximate cause of his wife's death. When the County responded to his interrogatories by invoking 23 U.S.C. § 409 and RCW 42.17.310(1)(j), Guillen moved to compel, whereupon the County moved for a protective order. The court granted Guillen's motion, denied the County's, and ordered pretrial discovery of the following materials and data:

1. The identity of all employees, agents, or officials of Defendant Pierce County who have knowledge of automobile accidents taking place at the intersection at issue for the time period January 1, 1990 through July 4, 1996;

2. The identity of all persons within Pierce County's knowledge who have been involved in automobile accidents at the intersection at issue for the time period of January 1, 1990 through July 5, 1996;

3. The identity of all Pierce County deputy sheriffs who patrolled the intersection at issue during the time frame of January 1, 1990 through July 4, 1996;

4. The date, identity of all persons involved, and the identity of all fatalities for each automobile accident occurring at the intersection at issue for the time period of January 1, 1990 through July 5, 1996;

5. A copy of all photographs[] Pierce County has in its possession, control or custody of accidents involving at least one automobile at the intersection at issue from January 1, 1990 through July 6, 1996;

6. A copy of all written statements by witnesses to accidents at the intersection at issue that occurred during the time period of January 1, 1990 through July 6, 1996; and

7. A copy of all accident reports sent to Pierce County from individuals who had been involved in automobile accidents at the intersection at issue from January 1, 1990 through July 4, 1996.

---

that it was not necessary to assert the [section 409] privilege for these particular documents, and they were provided to plaintiff." CP at 40.

Am. Order Granting Pl's. Mot. to Compel Disc. at 1-2.

On December 7, 1998, the County successfully moved the Court of Appeals for discretionary review and for consolidation of the case with Guillen's appeal of the PDA ruling. The Court of Appeals issued its decision on August 6, 1999, holding that the 23 U.S.C. § 409 privilege covered only one of the disputed items. Accident reports were *not* covered, the court ruled, since "Guillen carefully requested reports in the hands of the sheriff or other law enforcement agencies, *not* reports or data 'collected or compiled' by the Public Works Department 'pursuant to' Section 152." *Guillen v. Pierce County*, 96 Wn. App. 862, 873, 982 P.2d 123 (1999) (emphasis added). In the final footnote of its opinion, though, the court raised a more fundamental question regarding the constitutionality of § 409 as amended in 1995:

> It is arguable that Congress lacks the authority to dictate rules of discovery and rules of admissibility for use in *state* court. In particular, it is at least arguable that Congress lacks the authority to tell this state, or any state, that it "shall not" disclose or admit, in *state* court litigation, "reports . . . or data compiled or collected" by a *state* agency (e.g., Pierce County's Public Works Department). Throughout this opinion, we have *assumed* that section 409 is constitutional, because neither party has raised or briefed that question.

*Guillen*, 96 Wn. App. at 875 n.26 (emphasis added). We granted review on January 5, 2000.

## *Whitmer*

On August 8, 1996, a Ford Taurus driven by petitioner Chin Yuk and owned by petitioner Chang Choi turned from 75th Street West onto Custer Road in Lakewood and collided with a Volkswagen being driven by respondent Denel Whitmer along Custer Road. The intersection was designed with a stop sign on 75th Street, but none on Custer Road for through traffic. Both Denel and her sister

Shana Whitmer, a minor, were knocked unconscious and later diagnosed as having sustained brain injuries.

The Whitmer family filed a tort claim against, inter alia, the City of Lakewood and Pierce County for negligent operation of the intersection. In response to interrogatories requesting copies of publicly held materials relating to that intersection's traffic and accident history, the petitioners claimed such materials were privileged under 23 U.S.C. § 409. The Whitmers moved to compel discovery. On August 27, 1998, the trial court denied the Whitmers' motion, ruling that local governments had standing to invoke § 409 and that the privilege covered all of the disputed materials. However, on February 11, 2000, the court reversed its ruling, based on the *Guillen* decision, concluding that *none* of the following documents was covered by the § 409 privilege:

[Section 409 Privilege] Claimed by Pierce County:

1. Multi-file Inventory Listing Detail: Computer Print out of accident information that would be retained in computer file.

2. Accident Reports — Dated: 9/24/90, 7/21/93, 1/6/96, 6/11/90, 6/9/93, 3/28/90, 5/14/93, 11/13/91, 12/17/94, 9/25/92, 10/11/94, 4/24/92, 9/20/94, 7/31/90, 8/31/94, 4/2/91, 4/29/94, 12/11/92, 2/17/94, 9/25/92, 1/21/94, 9/3/92, 12/9/95, 7/27/92, 12/1/95, 4/24/92, 9/19/95, 3/13/92, 8/22/95, 2/25/92, 3/20/95, 9/24/93, 2/12/95, 4/2/93, 3/11/93, 4/7/93, 10/4/95, 10/6/95, 1/29/93, 4/20/92, 6/2/93, 11/23/94, 12/10/94, 1/27/90, 2/5/90, 4/7/93, 4/30/92, 5/7/92, 5/22/90, 8/4/92, 8/30/90, 11/1/91, 11/15/90, 11/21/91.

3. Computer Printout Pages 1990-1996; from 8/8/97 and 7/16/97; containing summary information on dates of accidents.

4. Response to citizen complaint letter: original letter from Margaret Smith to Thomas Ballard; response letter, date 2/8/91 from Thomas Ballard to Margaret Smith concerning light and fixing cost of light at approximately $125,000.

5. Table 1 - 24 - Vehicular Traffic Evaluations and Traffic Signal Warrant Evaluation.

6. Pierce County Public Works Signal Warrant Form.

7. Vehicle Volume Summaries - Dated: 12/11/90, 8/1/88, 11/7/95, 11/8/95, 9/30/93, 7/18/89, 9/21/95, 9/20/95, 6/7/94,

10/14/93, 7/14/92, 10/25/90, 7/18/91, 7/20/89, 7/25/9 [sic], 11/28/95, 7/14/92.

8. State of Washington Urban Arterial Board Project Prospectus, revised 1/6/69.

9. Pierce County Six-Year Plans — 1990-1996.

[Section 409 Privilege] Claimed by City of Lakewood:

1. Memo; 5/14/96; from Rory Grindley, Associate Traffic Engineer; to Bill Larkin, Engineering Manager, City of Lakewood; regarding Pierce County Public Works and Utilities Transportation Service Traffic Division Review of McDonald's Restaurant Traffic Impact Analysis.

2. Private Traffic Impact Analysis for Chevron at 74th Street West and Lakewood Drive; 2/13/96.

3. 75th Street W. and Custer Road (Lakewood Drive) Intersection Evaluation (augmenting Private Traffic Impact Analysis, supra # 2); 4/10/96.

4. Private Traffic Impact Analysis for McDonald's at 75th Street W. and Lakewood Drive; 4/30/96.

5. Handwritten extract of accident data for 75th Street W. and Custer Road and for the Curve between 74th Street West and 75th Street West for the years of 1994, 95, and 96.

6. Fax cover sheet; 2/12/97; from Grindley; to Larkin; transmitting Pierce County Level of Service calculations for 74th Street West and Lakewood Drive plus "assumed signal timing info used."

7. Handwritten notes and diagram of Custer Road at Lakewood Drive to 75th Street W. showing "ADT COUNTS PM Peak". 1 page.

8. City of Lakewood Six Year Comprehensive Transportation Program: Amended 1997 & 1998 - 2003.

9. Documents associated with the Urban Arterial Trust Account (UATA)

- Urban Program Application: including "Transportation Improvement Board Funding Application Arterial Inventory Sheet" (two types: representing before and after the project).

- "Attachment A—Accident Reduction & Annual Benefit" pert[ai]ning to intersection of 75th Street W. and Lakewood Drive.

- "Attachment B—Annual Benefit Summary Sheet."
- "Transportation Improvement Board controlled Intersection Data Continuation Sheet:" (two types: one pertaining to the intersection of 75th Street W. and Custer Road and one pertaining to both that intersection and the intersection of Lakewood Drive and Custer Road).

CP at 440-41. The trial court also ruled that the § 409 privilege did not cover other requested materials identified as "photographs," "notes," "letters," "memoranda," "bid sheets," "traffic signal priority array summaries," and "cross reference sheets." CP at 443-45.[3] We granted direct review in *Whitmer*, consolidated it with *Guillen*, and requested supplemental briefing from all parties on issues relating to § 409's constitutionality.

## ISSUES

(1) Whether Washington law bars disclosure or discovery of accident reports.

(2) Whether materials and data sought by the respondents in these cases were "compiled or collected" pursuant to 23 U.S.C. § 152 such that they would be covered by the federal privilege established by 23 U.S.C. § 409 as amended by Congress in 1995.

(3) Whether Congress exceeded its enumerated powers under the United States Constitution by barring state and local courts from allowing discovery of, or admitting into evidence, collections of state and local traffic and accident materials and data originally created and collected for state or local purposes and essential to the proper adjudication of claims brought under state or local law, simply because such materials and raw facts are *also* collected and used pursuant to a federal mandate to identify especially hazardous traffic sites.

---

[3] None of the materials at issue in *Whitmer* or in *Guillen* was actually reviewed by the respective trial courts in camera or made part of the appellate record under seal.

(4) Whether Guillen is entitled to attorney fees under the Public Disclosure Act.

## ANALYSIS

We conduct de novo review of summary judgment rulings, considering all facts and reasonable inferences in the light most favorable to the nonmoving party. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994).

### I

First, we examine whether Guillen's disclosure claims pertaining to accident reports are resolvable under Washington law.[4] In November 1972, Washington voters approved Initiative Measure No. 276, a "strongly worded mandate for broad disclosure of public records." *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 33-36, 769 P.2d 283 (1989). *See* LAWS OF 1973, ch. 1. "Public record" includes "any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." RCW 42.17.020(36). While "mindful of the right of individuals to privacy and of the desirability of the efficient administration of government, full access to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free

---

[4] The Washington Association of Prosecuting Attorneys (WAPA) faults the Court of Appeals' *Guillen* opinion for "fail[ing] to address the issue of the effect of RCW 46.52.080 on the county's obligation to produce accident reports in response to discovery or public records requests." Br. of Amicus WAPA at 8. The complaint appears to have merit. The RCW 46.52.080 issue was duly raised by Pierce County before the Court of Appeals in *Guillen*, *see* Mot. for Discretionary Review (Dec. 7, 1998) at 2, and the Court of Appeals expressly acknowledged the issue when it granted review. *See* Ruling Granting Review and Consolidating Cases (Jan. 15, 1999) at 2. Yet, without addressing RCW 46.52.080, the Court of Appeals ruled, simply, that "[t]he trial court properly granted Guillen's request for disclosure of accident reports pertaining to the subject intersection." *Guillen*, 96 Wn. App. at 873. The RCW 46.52.080 issue is properly before us.

society." RCW 42.17.010(11). In 1992, the following public policy statement was added to the PDA's "Public Records" section:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created. The public records subdivision of this chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy.

RCW 42.17.251. Thus, as we have previously noted, the PDA's intent was

> nothing less than the preservation of the most central tenets of representative government, namely, the sovereignty of the people and the accountability to the people of public officials and institutions. RCW 42.17.251. Without tools such as the Public Records Act, government of the people, by the people, for the people, risks becoming government of the people, by the bureaucrats, for the special interests. In the famous words of James Madison, "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter to W.T. Barry, Aug. 4, 1822, 9 *The Writings of James Madison* 103 (Gaillard Hunt, ed. 1910).

*Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 251, 884 P.2d 592 (1994).

In any public disclosure dispute, the government bears the burden "to establish that refusal to permit public inspection and copying is in accordance with a statute that exempts or prohibits disclosure in whole or in part of specific information or records." RCW 42.17.340(1).[5] Pierce County claims that the materials at issue in *Guillen* are

---

[5] *See also Cowles Publ'g Co. v. City of Spokane*, 69 Wn. App. 678, 849 P.2d 1271, *review denied*, 122 Wn.2d 1013 (1993); *Tacoma News, Inc. v. Tacoma-Pierce County Health Dep't*, 55 Wn. App. 515, 778 P.2d 1066 (1989), *review denied*, 113 Wn.2d 1037 (1990).

exempt from public disclosure under RCW 42.17.260(1):

> Each agency, in accordance with published rules, shall make available for public inspection and copying all public records, *unless the record falls within the specific exemptions of* subsection (6) of this section, RCW 42.17.310, 42.17.315, or other statute which exempts or prohibits disclosure of specific information or records.

RCW 42.17.260(1) (emphasis added).[6]

■ ■ Section (1)(j) of RCW 42.17.310, referenced in .260(1), exempts from public disclosure any "[r]ecords which are relevant to a controversy to which an agency is a party but which records would not be available to another party under the rules of pretrial discovery for causes pending in the superior courts." While there was no pending superior court cause stemming from the death of Guillen's wife and injuries to her passengers when he made his PDA request, we have recognized that the PDA "was not intended to be used as a tool for pretrial discovery," *Limstrom v. Ladenburg*, 136 Wn.2d 595, 614 n.9, 963 P.2d 869 (1998), and have accordingly construed the term "controversy" in RCW 42.17.310(1)(j) as inclusive of past and present litigation as well as "reasonably anticipated" litigation. *See Dawson v. Daly*, 120 Wn.2d 782, 791, 845 P.2d 995 (1993). Given the factual circumstances here, we find that litigation involving Pierce County as a party was reasonably anticipated at the time of Guillen's PDA request. Thus, any materials that would be nondiscoverable in that anticipated litigation under "rules of pretrial discovery for causes pending in the superior courts," such as CR 26(b), would also be exempt from public disclosure under RCW 42.17-.310(1)(j).

■ ■ Confidentiality of "Accident Reports": We next consider whether accident reports are subject to PDA

---

[6] The term "agency" includes "local agencies," which in turn includes "every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof . . . ." RCW 42.17.020(1). Petitioners Pierce County and the City of Lakewood are therefore both subject to RCW 42.17.260(1). *See Dawson v. Daly*, 120 Wn.2d 782, 788, 845 P.2d 995 (1993).

requests. The Court of Appeals held that "[t]he trial court properly granted Guillen's requests to disclose . . . (d) accident reports sent to the County from citizens involved in accidents at the intersection." *Guillen,* 96 Wn. App. at 874. Had that ruling been made solely in the context of a PDA lawsuit, it would have been in error. RCW 46.52.080 specifically provides:

> All required accident reports and supplemental reports and copies thereof shall be without prejudice to the individual so reporting and shall be for the confidential use of the county prosecuting attorney and chief of police or county sheriff, as the case may be, and the director of licensing and the chief of the Washington state patrol, and other officer or commission as authorized by law, except that any such officer shall disclose the names and addresses of persons reported as involved in an accident or as witnesses thereto, the vehicle license plate numbers and descriptions of vehicles involved, and the date, time and location of an accident, to any person who may have a proper interest therein, including the driver or drivers involved, or the legal guardian thereof, the parent of a minor driver, any person injured therein, the owner of vehicles or property damaged thereby, or any authorized representative of such an interested party, or the attorney or insurer thereof. No such accident report or copy thereof shall be used as evidence in any trial, civil or criminal, arising out of an accident [with certain exceptions not relevant here]..

We have held that the phrase "accident reports and supplemental reports" in RCW 46.52.080 refers to reports prepared pursuant to RCW 46.52.030(1) or .040 by persons involved in the accidents, not to official "police officer's reports" or "investigator's reports" prepared pursuant to RCW 46.52.030(3) or .070.[7] *Superior Asphalt & Concrete*

---

[7] *See* RCW 46.52.030(1) ("**Accident reports.** (1) Unless a report is to be made by a law enforcement officer under subsection (3) of this section, the driver of any vehicle involved in an accident resulting in injury to or death of any person or [serious] damage to the property of any one . . . shall . . . make a written report of such accident . . . ."); RCW 46.52.040 (requiring vehicle's occupant to prepare the "accident report" if operator is physically incapacitated); *cf.* RCW 46.52.070 ("**Police officer's report.** (1) Any police officer of the state of Washington or of any county, city, town or other political subdivision, present at the scene of any accident or in possession of any facts concerning any accident whether by way of

*Co. v. Dep't of Labor & Indus.*, 19 Wn. App. 800, 806, 578 P.2d 59 (1978) (noting RCW 46.52.080 "mandates confidentiality of reports made by persons involved in an accident") (citing *Gooldy v. Golden Grain Trucking Co.*, 69 Wn.2d 610, 419 P.2d 582 (1966)). While these "accident reports" themselves are for the confidential use of certain public officials and exempt from public disclosure, RCW 46.52.080 and .083 entitle parties having "a proper interest" in the accident to disclosure of certain basic data contained in those reports. Guillen, however, does not qualify, since the statute's examples of qualifying parties clearly indicate a restricted understanding of "proper interest" that cannot reasonably be construed to include persons involved in entirely different accidents at the same location.[8]

█ Discovery of "Accident Reports": Still, simply because such accident reports are "confidential" and not subject to PDA requests does not mean they are "privileged" in the sense of being immune from CR 26, Washington's broad civil discovery rule. In *Mebust v. Mayco Manufacturing Co.*, 8 Wn. App. 359, 506 P.2d 326 (1973), the court held that the

official investigation or otherwise shall make report thereof in the same manner as required of the parties to such accident and as fully as the facts in his possession concerning such accident will permit."); RCW 46.52.030(3) ("Any law enforcement officer who investigates an accident for which a report is required under subsection (1) of this section shall submit an investigator's report as required by RCW 46.52.070.").

[8] We note, however, that RCW 46.52.060 mandates that the "number of accidents" at each location, along with their "frequency and circumstances thereof," be "publish[ed]" on a monthly and annual basis. *See* RCW 46.52.060 ("It shall be the duty of the chief of the Washington state patrol to file, tabulate, and analyze all accident reports and to publish annually, immediately following the close of each fiscal year, and monthly during the course of the year, statistical information based thereon showing the number of accidents, the location, the frequency and circumstances thereof and other statistical information which may prove of assistance in determining the cause of vehicular accidents."). RCW 42.17.251 mandates that PDA provisions be "liberally construed," and the term "publish" has been defined as follows: "To make public; to circulate; to make known to people in general. To issue; to put into circulation. . . . An advising of the public or making known of something to the public for a purpose." BLACK'S LAW DICTIONARY 1233 (6th ed. 1990). Thus, while only the public entities identified in the second paragraph of RCW 46.52.060 would be entitled to disclosure of the "accident reports" themselves and any "analysis or reports thereof," RCW 46.52.060 would still entitle Guillen to public disclosure of the following raw data: "the number of accidents" at the location in question, the "frequency," and the "circumstances thereof."

"confidential" statutory status of certain documents "does not place them beyond the reach of *any* judicial process." *Id.* at 361.[9] It is certainly true that, under RCW 46.52.080, accident reports are "privileged" *in the sense that* they are inadmissible as evidence at trial. RCW 46.52.080 expressly provides, "No such accident report or copy thereof shall be used as evidence in any trial, civil or criminal, arising out of an accident." But the very fact that this statute expressly bars admission of these reports as evidence at trial without also barring their pretrial discovery is strong indication that such reports are not "privileged" in the sense of being exempt from CR 26(b)(1).[10] We hold that there is no state law precluding Guillen from being granted pretrial discovery in his tort case of relevant "(d) accident reports sent to the County from citizens involved in accidents at the intersection." *Guillen*, 96 Wn. App. at 874.

## II

■ Secondly, we examine petitioners' claim that the accident reports and other materials and data in *Guillen* and *Whitmer* were "compiled or collected" pursuant to 23 U.S.C. § 152 such that they would be covered by the federal privilege established by 23 U.S.C. § 409 as amended by Congress in 1995. The burden of showing that a privilege applies in any given situation rests entirely upon the entity asserting the privilege. *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964). In its present form, § 409 reads:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of

---

[9] While *Mebust* recognized our holding in *Folden v. Robinson*, 58 Wn.2d 760, 364 P.2d 924 (1961), regarding inadmissibility, the court stressed the need to narrowly circumscribe any privilege and the importance of maintaining liberal *discovery* rules. *Mebust*, 8 Wn. App. at 361.

[10] RCW 46.52.080 would bar only pretrial discovery of an individual's "accident report" where its discovery to an opposing party would violate the statutory quaranty against "prejudice to the individual so reporting." RCW 46.52.080; *see, e.g., Gooldy*, 69 Wn.2d at 613-14; *City of Seattle v. Gerry*, 76 Wn.2d 689, 698, 458 P.2d 548 (1969). Discovery of the third party accident reports at issue here, however, would not result in legal prejudice to the individuals who reported their prior collisions at the same intersection. Here, therefore, they are fully discoverable.

identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

Legislative Background of § 409: The application of § 409 is a question of first impression for this court. Other than *Guillen*, there appears to be no Washington, Ninth Circuit, or United States Supreme Court case law involving § 409. We begin our analysis by examining 23 U.S.C. § 152, entitled "Hazard elimination program," one of the three provisions[11] referenced in § 409:

Each state shall conduct and systematically maintain an engineering survey of all public roads to identify hazardous locations, sections, and elements, including roadside obstacles and unmarked or poorly marked roads, which may constitute a danger to motorists, bicyclists, and pedestrians, assign priorities for the correction of such locations, sections, and elements, and establish and implement a schedule of projects for their improvement.

This 1973 statute apparently had a side effect not intended by Congress. By forcing state and local governments to identify all "public roads" that "may constitute a danger to motorists, bicyclists, and pedestrians," and to rank the most hazardous among them *in writing*, Congress accorded private tort plaintiffs an *added* advantage in their efforts to prove negligent governmental design or maintenance of certain traffic sites. In 1987, Congress enacted 23 U.S.C.

---

[11] Pub. L. No. 93-87, Title II, § 209(a), 87 Stat. 250, 286 (Aug. 13, 1973). The other two statutes referenced in § 409 relate to federal safety improvements programs for rail crossings (§ 130) and highway bridges (§ 144), not applicable here. Much of the § 409 case law, though, relates to rail crossing data, collected pursuant to § 130 rather than to § 152.

§ 409 at least in part to address this problem.[12] Although Congress provided no statement of legislative intent, courts have concluded that § 409 was designed to prevent §§ 130, 144 and 152 "from providing an *additional*, virtually no-work tool for direct use in private litigation," *Light v. State*, 560 N.Y.S.2d 962, 965, 149 Misc. 2d 75 (Ct. Cl. 1990) (emphasis added); *see also Perkins v. Dep't of Transp.*, 65 Ohio App. 3d 487, 584 N.E.2d 794, 802 (1989),[13] and to " 'facilitate candor in administrative evaluations of highway safety hazards' " and in the implementation of federally funded safety enhancements. *Robertson v. Union Pac. R.R.*, 954 F.2d 1433, 1435 (8th Cir. 1992) (quoting *Duncan v. Union Pac. R.R.*, 790 P.2d 595, 597 (Utah 1990)).[14]

Early § 409 Case Law: For the next several years, most state courts restricted the application of the federal privilege established in § 409 to "reports, surveys, schedules, lists, or data" that had been *specifically* created for the purpose of applying for federal safety improvement funding or implementing a funded project. Such decisions often relied on the admonition in *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974), that privileges are "exceptions to the demand for every man's evidence" and are therefore "not lightly created nor expansively construed, for they are in derogation of the search for truth." *Id.* at 710.[15] These courts voiced strong objection to application of a federal privilege in § 409 to traffic and

---

[12] Pub. L. No. 100-17, Title I, § 132(a), 101 Stat. 170 (Apr. 2, 1987).

[13] As originally enacted, § 409 made referenced materials inadmissible only as evidence at trial. *Light*, 560 N.Y.S.2d at 963 (interpreting pre-1991 version of § 409). In 1991, though, Congress amended § 409 so as to make them nondiscoverable as well.

[14] *See Rodenbeck v. Norfolk & W. Ry.*, 982 F. Supp. 620, 624 (N.D. Ind. 1997) (noting that if a government "knows that its candid efforts of persuasion" to secure safety improvement funds "may ultimately be used against it, [that government] will be far less forthcoming in offering any 'data' by which that discretion can be exercised, and indeed may choose not to offer safety suggestions at all.").

[15] *See also Trammel v. United States*, 445 U.S. 40, 50, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980):

Testimonial exclusionary rules and privileges contravene the fundamental principle that " 'the public . . . has a right to every man's evidence.' " *United States* v. *Bryan*, 339 U. S. 323, 331[, 70 S. Ct. 724, 730, 94 L. Ed. 884] (1950).

accident materials and raw data prepared for state and local purposes simply because they were *also* "collected" for uses related to §§ 130, 144 and 152, an unacceptable outcome ridiculed as "imprudent"[16] and "anomalous."[17]

Shortly after § 409 was enacted, a Louisiana trial court construed the privilege broadly to include " '*all information gathered* pursuant to the federal programs covered by this statute.' " *Martinolich v. S. Pac. Transp. Co.*, 532 So. 2d 435, 437 (La. Ct. App. 1988) (emphasis added), *writ denied*, 535 So. 2d 745 (La.), *cert. denied sub nom. La. Dep't of Transp. & Dev. v. Nick Martinolich, Inc.*, 490 U.S. 1109, 109 S. Ct. 3164, 104 L. Ed. 2d 1027 (1989). But that ruling was promptly vacated as "clearly wrong." *Id.* Stressing the heavy presumption against federal preemption in an area of law traditionally occupied by states such as "regulation of [a state] court system," *id.* at 438, the Louisiana Court of Appeals adopted a more conservative understanding of § 409:

> Clearly Congress has not endeavored, by way of this statute [§ 409], to occupy the field of Louisiana's evidentiary rules or our Code of Civil Procedure. Where Congressional enactments do not exclude all state legislation in the field, preemption is to the extent of the conflict between them. . . . Because preemption is not presumed, we construe 23 U.S.C. § 409 restrictively, to intrude only so much as Congress has expressly prescribed.

*Id.* A few years later, Louisiana's Supreme Court issued *Wiedeman v. Dixie Electric Membership Corp.*, 627 So. 2d 170 (La. 1993), *cert. denied*, 511 U.S. 1127 (1994). Consistent with § 409's perceived legislative purpose, the *Wiedeman* court ruled that the privilege covered *only* the following materials:

---

As such, [privileges] must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Elkins* v. *United States*, 364 U. S. 206, 234[, 80 S. Ct. 1437, 1449, 4 L. Ed. 2d 1669] (1960) (Frankfurter, J., dissenting).

[16] *Palacios v. La. & Delta R.R.*, 682 So. 2d 806, 810 (La. Ct. App. 1996).

[17] *Tardy v. Norfolk S. Corp.*, 103 Ohio App. 3d 372, 659 N.E.2d 817, 820 (1995).

(1) surveys to identify hazardous railroad crossings and improve them (§ 130);

(2) applications for federal assistance in replacing or rehabilitating highway bridges (§ 144);

(3) studies assigning priorities and schedules of projects for highway improvement (§ 152); and,

(4) other compilations made for developing highway safety construction projects which would utilize Federal-aid funds (§ 409).

*Id.* at 173. The court flatly rejected, though, the "expansive interpretation that would protect *data and raw facts*," ruling that the § 409 privilege did *not* include "(1) accident reports; (2) traffic counts; and (3) other raw data *collected* by" the governmental agency responsible for identifying and evaluating good candidates for safety enhancement grants. *Id.* (emphasis added). "Section 409 creates a privilege for compilations enumerated in the statute, but the privilege does not extend to reports and data gathered for or incorporated into such compilations." *Id.*[18]

In *Tardy v. Norfolk Southern Corp.*, 103 Ohio App. 3d 372, 659 N.E.2d 817 (1995), the Ohio Court of Appeals agreed with the reasoning of Louisiana's courts, rejecting a railroad company's contention that an expert affidavit describing the number and nature of prior accidents at the railway crossing in question was privileged under § 409:

If a dozen people had been killed at a site, a trier of fact might reasonably infer that the site was dangerous. These dozen deaths would naturally be included in statistics gathered for inclusion in official reports made pursuant to Section 409. The question then becomes: Does the fact that information of previous accidents at a site is included in reports made under Section 409 make all evidence of the previous accidents inadmissible? We think not. If all accidents are reported and no

---

[18] *See also Miguez v. S. Pac. Transp. Co.*, 645 So. 2d 1184, 1189 (La. Ct. App. 1994) (finding it "unwise from a practical perspective" to construe § 409 so broadly as "to unilaterally place off limits evidence so vital to the court's quest for the truth," effectively "provid[ing] a drop rug under which a potentially liable party may conveniently conceal its prior misconduct," thereby "deny[ing] legitimate accident victims the only system of redress available to them.").

evidence of prior reported accidents is admissible, a plaintiff could never meet the burden of proof under [Ohio tort law]—an anomalous result.

*Id.* at 820.

In *Kitts v. Norfolk & Western Railway*, 152 F.R.D. 78 (S.D. W. Va. 1993), a West Virginia court also construed § 409 narrowly, explaining that the privilege "clearly does *not* accord protection for documents or data prepared or compiled for some entirely separate and distinct purpose, even if the *contents* of the same, or parts thereof, eventually become ingredients thrown into a soup kettle with a distinct flavor of safety enhancement." *Id.* at 81 (emphasis added).

Meanwhile, in Arizona, a wrongful death claim was filed after a train collided with a milk truck driven by Mary Isbell's husband at an uncontrolled railroad crossing. *S. Pac. Transp. Co. v. Yarnell*, 181 Ariz. 316, 890 P.2d 611, 612 (1995). "The state and Southern Pacific argued that [§ 409] exempted from discovery not only the reports, surveys, schedules, lists, or data compilations made for the purposes identified in the statute, but also all the facts in those reports even if available from other sources." *Id.* The trial court granted the plaintiff's motion to compel, concluding that § 409 "only protected the reports themselves, and not the underlying facts." *Id.* Arizona's Supreme Court agreed:

Construing the statute to cover all facts that ultimately end up in such compilations, from whatever source derived, would go far beyond protecting the safety enhancement process and indeed would turn that process on its head. It would prevent the parties from proving claims that could otherwise have been proven had there been no safety enhancement project. The [United States] Supreme Court has held that the federal railroad safety enhancement program does not preempt state damage claims. . . .

But state damage claims can only be proved with facts. . . . *[T]he breadth of exemption from discovery and admissibility argued by Southern Pacific and the state, and acknowledged by the court of appeals, would sacrifice the state tort scheme on the altar of the federal statutory scheme.*

*Id.* at 613 (emphasis added) (citing *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993)).[19] Observing that each of the key terms in § 409—"reports," "surveys," "schedules," "lists" and "data" —corresponds to a specific term of art used in §§ 130, 144, and 152,[20] the court held "that the documents exempt from discovery and excluded from evidence under § 409 are precisely the documents described and prepared under the authority of §§ 130, 144, and 152, and no others." *Id.* at 614. By excluding from the privilege all facts and materials "that ultimately end up in such compilations," the court explained that it hoped to "promote the integrity of the federal regulatory scheme without compromising the integrity of the parallel state tort system." *Id.* at 613, 614-15.[21]

---

[19] In 1961, Washington statutorily waived its absolute sovereign immunity: "The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation." RCW 4.92.090. Citing *Kelso v. City of Tacoma*, 63 Wn.2d 913, 390 P.2d 2 (1964), Whitmer argues that, "[a]s a matter of public policy, this attempt by these municipalities to hide evidence of their misconduct would violate the statutory waiver of sovereign immunity applicable to all governmental entities within the State of Washington, and would place governmental tortfeasors above the law and not answerable to our Supreme Court's Civil Rules." CP (*Whitmer*) at 40. While the privilege does not per se violate RCW 4.92.090, the statute does evidence a strong public policy of holding governments accountable for their tortious conduct.

[20] As the *Yarnell* court explained:

Thus when § 409 refers to "surveys" and "schedules," it is referring specifically to those surveys and schedules prepared pursuant to 23 U.S.C. § 130(d). Similarly, 23 U.S.C. § 144(e) . . . requires the federal government to inventory, classify, and prioritize highway bridges and categorizes this as "*data*." (Emphasis added.) And, 23 U.S.C. § 152 (hazardous roads), requires the states to "*survey*" roads, implement a "*schedule*" of projects for improvement, and submit a "*report*" to the federal government on progress being made to implement highway safety improvement projects. 23 U.S.C. § 152(a), (g) (emphasis added).

*Yarnell*, 890 P.2d at 614.

[21] Federal courts during this period tended to embrace a more expansive understanding of § 409. In *Robertson v. Union Pacific Railroad*, 954 F.2d 1433 (8th Cir. 1992), the Eighth Circuit held that § 409 "provides a fairly broad exclusion." *Id.* at 1435. The court deemed "without merit" the plaintiff's claim that materials were not privileged if "not collected or utilized *solely* for federal funding projects." *Id.* at 1435 n.3 (emphasis added). Rather, the court held that § 409 covered all materials compiled "pursuant to Sections 130, 144, and 152" even if "available for other uses and purposes." *Id.* at 1435 & n.3. The Eighth Circuit reiterated its

<u>1995 Amendment to § 409:</u> The United States Congress evidently disagreed with such restricted readings of § 409 by state courts, and in 1995 amended the statute by inserting two words after the word "compiled": "or collected." Lest there be any doubt regarding its intentions in doing so, Congress published an accompanying "clarification" in the Congressional Record:

> This section amends section 409 of title 23 to clarify that *data "collected" for safety reports or surveys* shall not be subject to discovery or admitted into evidence in Federal or State court proceedings.
>
> *This clarification is included in response to recent State court interpretations of the term "data compiled" in the current section 409 of title 23*. It is intended that *raw data* collected prior to being made part of any formal or bound report shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mention[ed] or addressed in such data.

H.R. REP. 104-246 § 328, at 59 (1995) (emphasis added); *see* Act of Nov. 28, 1995, Pub. L. No. 104-59, 1995 U.S.C.C.A.N. (109 Stat.) 591.

<u>State Court Resistance:</u> It is a well-recognized rule of statutory construction that "where a law is amended and a material change is made in the wording, it is presumed that the legislature intended a change in the law." *Home Indem. Co. v. McClellan Motors, Inc.*, 77 Wn.2d 1, 3, 459 P.2d 389 (1969) (citing *Alexander v. Highfill*, 18 Wn.2d 733, 140 P.2d 277 (1943)). However, despite Congress' 1995 amendment and "clarification," a few state courts have understandably remained reluctant to construe § 409 in a manner that

---

broad construction of § 409 in *Lusby v. Union Pacific Railroad*, 4 F.3d 639 (8th Cir. 1993), where it reversed a trial court that had allowed testimony by an expert who relied on state-held materials such as accident reports, explaining that "state materials do not fall outside the scope of § 409 merely because they are not compiled *solely* for federal reporting purposes and are available for other uses." *Id.* at 641 (emphasis added). The *Lusby* court held that as long as *one* of the reasons for compiling accident reports or other data was for "federal reporting purposes," they were privileged under § 409. *See also Taylor v. St. Louis S.W. Ry.*, 746 F. Supp. 50, 53-54 (D. Kan. 1990); *Harrison v. Burlington N. R.R.*, 965 F.2d 155 (7th Cir. 1992).

effectively creates a legal black hole into which state and local governments can drop virtually all accident materials and facts, simply by showing that such materials and "raw data" are *also* "collected" and used to identify and rank candidates for federal safety improvement projects state-wide, pursuant to §§ 130, 144, or 152. *See, e.g., Palacios v. La. & Delta R.R.*, 682 So. 2d 806 (La. Ct. App. 1996) (relying on *Wiedeman* despite Congress' 1995 amendment), *vacated*, 740 So. 2d 95 (La. 1999) (recognizing Congress' intent in 1995 to extend the § 409 privilege to all "collected" data); *Isbell ex rel. Isbell v. State*, 198 Ariz. 291, 9 P.3d 322 (2000) (rejecting claims that Congress' 1995 amendment had undermined its narrow *Yarnell* decision).[22] Still, most state courts have considered themselves obligated by the Supremacy Clause to try to absorb the "harsh" impact on state and local courts of § 409 as amended in 1995. *Coniker v. State*, 695 N.Y.S.2d 492, 495, 181 Misc. 2d 801 (1999).[23]

Statutory Application: We turn to the materials at issue in these consolidated cases to determine whether they were "compiled or collected" pursuant to § 152 such that they would be covered by the § 409 privilege as amended in 1995.

According to sworn declarations in the record, even prior to the accident that killed Guillen's wife, Pierce County had specifically collected and reviewed all the disputed accident reports, photos, witness statements, collision diagrams,

---

[22] The respondents also cite *Department of Transportation v. Superior Court*, 47 Cal. App. 4th 852, 857, 55 Cal. Rptr. 2d 2, 5 (1996), where the court declined to give § 409 the "broad construction" advanced by the defendants in that case, despite Congress' just-enacted 1995 amendment. The court based its ruling on a *factual* finding: "[W]hatever its effect, [Congress' 1995 amendment] did not eliminate the express requirement that the information at issue have been compiled or collected pursuant to section 152, a requirement that [the state] has failed to establish in this case." *Id.* at 855 n.2 (emphasis omitted). Here, by contrast, the sworn declarations in the record strongly suggest that *one* of the reasons the petitioner "compiled or collected" the disputed items and data was pursuant to § 152.

[23] *See, e.g., Mackie v. Grand Trunk W. R.R.*, 215 Mich. App. 20, 23-26, 544 N.W.2d 709 (1996); *Rodenbeck*, 982 F. Supp. at 621-25; *Reichert v. Dep't of Transp. & Dev.*, 694 So. 2d 193, 198 (La. 1997); *Fry v. S. Pac. Transp. Co.*, 715 So. 2d 632, 637 (La. Ct. App. 1998); *Sevario v. State ex rel. Dep't of Transp. & Dev.*, 752 So. 2d 221, 227-31 (La. Ct. App. 1999), *review denied*, 759 So. 2d 760 (La. 2000); *Long v. Dep't. of Transp. & Dev.*, 743 So. 2d 743 (La. Ct. App.), *review denied*, 751 So. 2d 885 (La. 1999), *cert. denied*, 529 U.S. 1110 (2000).

and other traffic and accident data relating to the intersection of 168th Street East and B Street East and had then sought § 152 funding to enhance its safety. Mot. for Discretionary Review, App. 8, Ex. A, Decl. of Thomas Ballard at 2. According to Thomas Ballard, Pierce County's Engineer, § 152 safety enhancements were specifically designed for that intersection, and all disputed items in *Guillen* "are reports and data compiled for those purposes." *Id.* Prospectuses compiled based on those collected traffic and accident materials and data were then sent to Washington's Department of Transportation (DOT) "in application for federal-aid highway funds available under 23 U.S.C. § 152." *Id.*

The "public road" at issue in *Whitmer*, while also eligible for consideration under § 152,[24] had not previously been the subject of an application for § 152 funds. The petitioners contend, however, that § 152's record-keeping mandate was *one* of the reasons they maintained their collections of accident reports, accident photos, correspondence, and other raw data relating to that intersection, and that those materials are therefore protected by the § 409 privilege. In a sworn declaration filed in *Whitmer*, Ballard explained how applications for federal § 152 funding are made in practice:

> I have directed my employees to collect and compile reports, surveys, schedules, lists, and other data for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites or hazardous roadway conditions pursuant to 23 U.S.C. 152 within unincorporated Pierce County which prior to incorporation [by Lakewood in 1996] included the intersection of Custer Road and 75th street.
>
> . . . .
>
> When a new allotment of section 152 money becomes available, the state gives localities such as Pierce County a deadline for identifying roads which are candidates for such funding. As part of the application process, localities need to provide the

---

[24] *See* 23 U.S.C. § 152(c) ("Funds authorized to carry out this section shall be available for expenditure on—(1) any public road[.]"); 23 U.S.C. § 101(27) ("The term 'public road' means any road or street under the jurisdiction of and maintained by a public authority and open to public travel.").

state specific information about the road in question, which helps the state and federal government prioritize the project and determine whether section 152 funds should be used for the given project. The information on the application includes traffic accidents, traffic counts, narrative descriptions of location, the proposed solutions[,] etc.[,] for the roadway in question. The time frame between notification that section 152 funding is available, and the deadline for the application process, is limited, requiring localities to have studies, reports, and data readily available for purposes of seeking section 152 funding.

CP at 292-93. According to a Deputy Assistant Secretary at the Washington State Department of Transportation who supervised § 152 federal hazard elimination grant applications:

The state requires Pierce County and all other counties[] to designate a primary road system within their counties, and to classify roads based on the volume of traffic, speeds, etc.[] The counties are required to monitor these roads and to collect data, reports and studies so as to determine whether a particular roadway is an appropriate candidate for funding under 23 USC § 152, so as to enhance its safety. The intersection of Custer Road and 75th Street is included within this system, and is eligible for consideration of § 152 funding. The reports, studies, data, etc. compiled for this intersection are considered when evaluating the roads throughout the state which are eligible for § 152 funding and are prioritized accordingly.

CP at 296, Decl. of Wayne T. Gruen, P.E., at 2.

■ Based upon these sworn declarations in the record, the accident reports, photos, collision diagrams, and other related materials and "raw data" sought by the respondents in these consolidated cases would appear to be *covered* by § 409 as amended in 1995. We simply cannot accept the Court of Appeals' distinction in *Guillen* between collections of traffic and accident related materials and raw data "as held" by Pierce County's *Public Works Department*, a local government agency involved in "Section 152 activity," and collections of traffic and accident related materials and raw data "as held" by Pierce County's *Sheriff's Office*, which the

court presumed was in no way involved in "Section 152 activity." 96 Wn. App. at 872. We find such a distinction unsound in principle and unworkable in practice.

Congress' 1995 amendment made clear that § 409 covers all "reports" and "raw data" publicly "collected" for, inter alia, the § 152 purpose of "identify[ing] hazardous locations, sections, and elements . . . ,which may constitute a danger to motorists, bicyclists, and pedestrians[.]" 23 U.S.C. § 152. Since no one can predict ahead of time *which* "locations, sections, and elements" will distinguish themselves over time as especially "danger[ous] to motorists, bicyclists, and pedestrians" and therefore good candidates for federal safety enhancement funds, § 152 requires jurisdictions to "systematically maintain" complete, *ongoing* collections of all accident related materials and data on "all public roads." 23 U.S.C. § 152. Thus, § 152's record-keeping mandate requires that Pierce County maintain not only accident materials and data on traffic sites that its Public Works Department has *already* identified as good candidates for § 152 safety enhancement funds, such as the intersection in *Guillen*, but also accident materials and data relating to traffic sites that its Public Works Department has *not yet* identified as hazardous, such as the intersection in *Whitmer*. All such records are "collected" pursuant to § 152.

Furthermore, it cannot be assumed that all state and local governments maintain *multiple* sets of materials such as accident reports, each held by a separate agency for a different use. While larger jurisdictions might "systematically maintain" one set of accident reports at their law enforcement department and a second set at their "Department of Transportation," or "Public Works Department," smaller jurisdictions would likely have *one* collection of accident reports, photos, and witness statements prepared by their law enforcement personnel, which would be consulted from time to time to identify especially hazardous sites, as mandated by § 152.

Applying § 409 only to accident reports "as held" by one *agency* of a local government but not "as held" by another,

and only to *copies* of a report but not to *originals*, is also unsound and unworkable given the fact that such legal distinctions are already being rendered meaningless by the electronic revolution underway. As governments everywhere move from paper and microfiche documentation into the age of twenty-first century information technology, public records are increasingly being stored—even *created*—in *digital* format, then added to virtual databases that are accessed, in streams of bits and bytes, by vast *networks* of governmental agencies, often across jurisdictional boundaries. Today's technology would already permit a responding law enforcement officer to type up an electronic accident report, complete with accident photographs, collision diagrams, and witness statements, and instantly send those files via satellite to a database accessible by multiple agencies for multiple purposes, only *one* of which would be to identify particularly hazardous sites in a given jurisdiction that may be good candidates for § 152 safety enhancements.

Under the Court of Appeals' approach, such an electronic database of accident reports would be covered by the § 409 privilege as amended in 1995, even if it were the *only existing collection* of accident reports and data, without which state and local courts could not properly adjudicate a variety of claims brought under state and local law. Were we to rely on the Court of Appeals' distinctions in applying the § 409 privilege, information technology would soon create a situation that the Court of Appeals itself recognized as "absurd," namely, "giv[ing] the County carte blanche to render immune from discovery every accident report related to a public road within its territory." *Guillen*, 96 Wn. App. at 872.

## III

We next turn to the examination of a more fundamental question, raised by the Court of Appeals itself in the final footnote of its *Guillen* opinion; namely, whether the United

States Constitution entitles Congress to "tell this state, or any state, that it 'shall not' disclose or admit, in *state* court litigation, 'reports . . . or data compiled or collected' by a *state* agency (e.g., Pierce County's Public Works Department)." 96 Wn. App. at 875 n.26. Specifically, we consider whether the 1995 amendment to 23 U.S.C. § 409 is constitutional and thus enforceable in state and federal courts, a question requiring analysis of federal preemption of state law, private parties' standing to raise federalist challenges, and the limits of Congressional power.

■■ (a) Express Preemption: There is a strong presumption against federal preemption of state police powers, and such presumption is even stronger in areas of the law where states have traditionally exercised their sovereignty. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 78-79, 896 P.2d 682 (1995). Deciding what materials or data are discoverable or admissible in cases brought in state court under state law is unquestionably an area where states have traditionally exercised their sovereignty. Still, "that presumption can be overcome if Congress intends that the federal law preempt state law." *All-Pure Chem. Co. v. White*, 127 Wn.2d 1, 5, 896 P.2d 697 (1995).[25]

Here, Congress clearly intended that the § 409 privilege preempt state laws and court rules governing pretrial discovery and the admissibility of evidence at trial. Not only does the statute begin with the words, "Notwithstanding any other provisions of law," but it specifically declares that the privilege is applicable in "Federal or State court." Such language leaves no doubt that this federal statute was designed to be expressly preemptive. *See Dep't of Transp. v. Superior Court*, 47 Cal. App. 4th 852, 854, 55 Cal. Rptr. 2d

---

[25] *See also Stevedoring Servs. of Am., Inc. v. Eggert*, 129 Wn.2d 17, 23, 914 P.2d 737 (1996); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977) ("Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, see, *e.g.*, U. S. Const., Art. I, § 10; *Patapsco Guano Co. v. North Carolina*, 171 U. S. 345, 358[, 18 S. Ct. 862, 867, 43 L. Ed. 191] (1898), 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice v. Santa Fe Elevator Corp.*, 331 U. S. 218, 230[, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447] (1947).").

2, 4 (1996); *Martinolich*, 532 So. 2d at 437.

■■ However, state law cannot be preempted by an unconstitutional federal law. The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides:

> This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.

Thus, state judges are constitutionally required only to uphold "laws of the United States *which shall be made in pursuance [of the United States Constitution]*." U.S. CONST. art. VI, cl. 2 (emphasis added).[26] Federal laws that exceed Congress' enumerated constitutional powers are unenforceable in state court—just as they are in federal court—whether or not Congress intended its laws to preempt "the Constitution or laws of any state." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991).

■■ (b) Standing: We next consider the issue of standing. Several courts have recognized, explicitly or implicitly, that private parties have standing to challenge the constitutionality of federal laws on federalist grounds, even when not joined by a state government. *See, e.g., Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1034 n.6 (11th Cir.

---

[26] The petitioners cite several § 409 cases that find express preemption controlling under the Supremacy Clause, but only *after* implicitly or explicitly finding § 409 constitutional. *See, e.g., Claspill v. Mo. Pac. R.R.*, 793 S.W.2d 139, 140-41 (Mo.) (en banc), *cert. denied*, 498 U.S. 984 (1990); *Sawyer v. Ill. Cent. Gulf R.R.*, 606 So. 2d 1069, 1073-74 (Miss. 1992) (resting on Supremacy Clause to reject plaintiff's argument that "the federal government has no authority to tell us what rules of evidence to enforce in the courts of this state"); *City of Atlanta v. Watson*, 267 Ga. 185, 475 S.E.2d 896, 903-04 (1996) (holding that "when a statute that has evidentiary implications is part of a larger federal statutory scheme, the Supremacy Clause demands that states adhere to the statute. To hold otherwise defeats a significant purpose of the federal act and cannot be justified in light of the Supremacy Clause.") (citing pre-1995 cases such as *Yarnell, Sawyer, Wiedeman*, and *Claspill*); *Long*, 743 So. 2d 743 (citing U.S. CONST. art. VI, cl. 2; *Jones*, 430 U.S. at 525). Some of these are pre-1995 cases, and it is uncontested that Congress had authority to enact § 409 in its *pre*-1995 form, insofar as the privilege was understood to apply only to materials and data created *exclusively* to comply with the federal government's mandates.

1992); *Atlanta Gas Light Co. v. United States Dep't of Energy*, 666 F.2d 1359, 1368 n.16 (11th Cir. 1982) (citing *Helvering v. Davis*, 301 U.S. 619, 637, 640, 57 S. Ct. 904, 81 L. Ed. 1307 (1937); *Steward Mach. Co. v. Davis*, 301 U.S. 548, 573, 585, 57 S. Ct. 883, 81 L. Ed. 1279 (1937)); *but see Vt. Assembly of Home Health Agencies, Inc. v. Shalala*, 18 F. Supp. 2d 355, 370-71 (D. Vt. 1998). As Justice O'Connor commented in dicta in *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992):

> The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power."

*Id.* at 181 (quoting *Coleman v. Thompson*, 501 U.S. 722, 759, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) (Blackmun, J., dissenting)).

> Where Congress exceeds its authority relative to the States, therefore, the departure from the constitutional plan cannot be ratified by the "consent" of state officials. An analogy to the separation of powers among the branches of the Federal Government clarifies this point. The Constitution's division of power among the three branches is violated where one branch invades the territory of another, *whether or not the encroached-upon branch approves the encroachment.*

*New York*, 505 U.S. at 182 (emphasis added). We agree with this reasoning and hold that private respondents are not deprived of standing to challenge the constitutionality of a federal law on federalism grounds simply because state officials oppose the challenge.

▮ (c) Enumerated Powers: Finally, we examine the merits of the federalism challenge. The final provision of the Bill of Rights guarantees that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states

respectively, or to the people." U.S. CONST. amend. X. While the Tenth Amendment was once viewed as little more than a meaningless truism, *see United States v. Darby*, 312 U.S. 100, 124, 61 S. Ct. 451, 85 L. Ed. 609 (1941), the United States Supreme Court has recently signaled a renewed commitment to enforcing the principle of dual sovereignty implicit in the American constitutional framework and made explicit in the Tenth Amendment,[27] stressing that "[t]he Constitution created a Federal Government of limited powers." *Gregory*, 501 U.S. at 457. As James Madison explained prior to the Constitution's ratification:

> The powers delegated by the proposed Constitution to the Federal Government, are few and defined. Those which are to remain in the State Governments are numerous and indefinite. . . . The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the State.

THE FEDERALIST No. 45, at 313 (James Madison) (Jacob E. Cooke ed., 1961). Alexander Hamilton predicted that federalism would enhance America's democracy by creating additional checks and balances:

> Power being almost always the rival of power; the General Government will at all times stand ready to check the usurpations of the state governments; and these will have the same disposition toward the General Government. The people, by throwing themselves into either scale, will infallibly make it preponderate. *If their rights are invaded by either, they can make use of the other, as the instrument of redress.*

THE FEDERALIST No. 28, at 179 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (emphasis added). The Court recently remarked about Hamilton's statements:

> One fairly can dispute whether our federalist system has been quite as successful in checking [Federal] government abuse as Hamilton promised, but there is no doubt about the

---

[27] *See, e.g.*, Lynn A. Baker, *The Revival of States' Rights: A Progress Report and a Proposal*, 22 HARV. J.L. & PUB. POL'Y 95 (1998).

design. If this "double security" is to be effective, there must be a proper balance between the States and the Federal Government. These twin powers will act as mutual restraints only if both are credible. In the tension between federal and state power lies the promise of liberty.

*Gregory*, 501 U.S. at 459.[28] Of course, as the Court noted,

The Federal Government holds a decided advantage in this delicate balance: the Supremacy Clause. . . . As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States. Congress may legislate in areas traditionally regulated by States. This is an extraordinary power in a federalist system. It is a power that we must assume Congress does not exercise lightly.

*Id.* at 460. Lightly or not, Congress has exercised this "extraordinary power" to such an extent in the past several decades that the highest court in the judicial branch of the *federal* government has found it necessary in a string of recent cases to invalidate laws that the federal government lacked constitutional authority to impose on the states.[29]

■■■ While duly enacted federal legislation is presumed constitutional, that presumption can be rebutted "upon a plain showing that Congress has exceeded its constitutional

---

[28] *See also Gregory*, 501 U.S. at 458 (noting that enforcement of a "balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front," just as the balance of power among the branches of the federal government does).

[29] *See, e.g. New York*, 505 U.S. 144 (holding Congress lacked the power to enact "take title" provision of Low-Level Radioactive Waste Policy Act); *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995) (holding that Gun-Free School Zones Act exceeded Congress' power); *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996) (holding that Congress lacked authority under Indian commerce clause to abrogate states' Eleventh Amendment immunity); *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997) (holding that Congress could not require state officers to conduct background checks on prospective handgun purchasers under Brady Handgun Violence Prevention Act); *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997) (holding that Freedom Restoration Act exceeded Congress' Fourteenth Amendment enforcement powers); *Alden v. Maine*, 527 U.S. 706, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999) (holding Congress could not subject state to suit in state court under Fair Labor Standards Act without its consent); *United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000) (invalidating civil remedy provision of Violence Against Women Act as exceeding commerce power).

bounds." *United States v. Morrison*, 529 U.S. 598, 607, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000). We therefore evaluate whether Congress acted outside its enumerated powers when it amended 23 U.S.C. § 409 in 1995. The petitioners argue that Congress had the power to enact the 1995 amendment under the Spending Clause,[30] the Commerce Clause,[31] and the Necessary and Proper Clause.[32]

■■■ (1) Spending Clause: The Spending Clause entitles Congress "to pay the debts and provide for the common defense and general welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. Over the years, Congress has often sought to influence state behavior by conditioning the receipt of federal funds upon behavioral changes. The United States Supreme Court has declared such a practice constitutional, *see United States v. Butler*, 297 U.S. 1, 66, 56 S. Ct. 312, 80 L. Ed. 477 (1936), *provided* Congress' conditions are "relevant" and "reasonably related" to a valid *federal* interest in a *specific* national project or program. *South Dakota v. Dole*, 483 U.S. 203, 208, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987). In *Dole*, the Court held that 23 U.S.C. § 158 was constitutional, finding that conditioning receipt of federal highway funds on state enactment of minimum drinking age laws was a proper exercise of Congress' spending power. The Court noted, though, that the "spending power is of course not unlimited, but is instead subject to several general restrictions articulated in our cases." *Id.* at 207 (citation omitted).

> [First,] the exercise of the spending power must be in pursuit of "the general welfare." In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress.

---

[30] Lakewood's Opening Br. at 21; Pierce County's Opening Br. (*Whitmer*) at 25-26 (passim); Lakewood's Reply Br. at 13-14; Pierce County's Suppl. Br. re: Federal Preemption (*Guillen*) at 4-10; Pierce County's Reply Br. (*Guillen*) at 3-5.

[31] Lakewood's Opening Br. at 15-21; Lakewood's Reply Br. at 5-13; Pierce County's Suppl. Br. re: Federal Preemption (*Guillen*) at 10-11; Pierce County's Reply Br. (*Guillen*) at 5-6.

[32] Pierce County's Suppl. Br. re: Federal Preemption (*Guillen*) at 11-12; Pierce County's Reply Br. re: Federal Preemption (*Guillen*) at 6-7.

Second, we have required that if Congress desires to condition the States' receipt of federal funds, it "must do so unambiguously . . . ." Third, our cases have suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated "to the federal interest in particular national projects or programs." *Massachusetts* v. *United States*, 435 U.S. 444, 461[, 98 S. Ct. 1153, 1164, 55 L. Ed. 2d 403] (1978) (plurality opinion).[33] *See also Ivanhoe Irrigation Dist.* v. *McCracken*, [357 U.S. 275, 295, 78 S. Ct. 1174, 2 L. Ed. 2d 1313 (1958)], ("[T]he Federal Government may establish and impose reasonable conditions relevant to federal interest in the project and to the over-all objectives thereof"). Finally, we have noted that other constitutional provisions may provide an independent bar to the conditional grant of federal funds.

*Id.* at 207-08 (some citations omitted).[34]

---

[33] "We have repeatedly held that the Federal Government may impose appropriate conditions on the use of federal property or privileges and may require that state instrumentalities comply with conditions that are *reasonably related to the federal interest* in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461, 98 S. Ct. 1153, 55 L. Ed. 2d 403 (1978) (emphasis added).

[34] In her dissent in *Dole*, Justice O'Connor agreed "that there are four separate types of limitations on the spending power," but argued that the majority's "application of the requirement that the condition imposed be reasonably related to the purpose for which the funds are expended is cursory and unconvincing." 483 U.S. at 213 (O'Connor, J., dissenting).

> When Congress appropriates money to build a highway, it is entitled to insist that the highway be a safe one. But it is not entitled to insist as a condition of the use of highway funds that the State impose or change regulations in other areas of the State's social and economic life because of an attenuated or tangential relationship to highway use or safety. Indeed, if the rule were otherwise, the Congress could effectively regulate almost any area of a State's social, political, or economic life on the theory that use of the interstate transportation system is somehow enhanced.

*Id.* at 215 (O'Connor, J., dissenting). She argued that Congress is only authorized under the Spending Clause to " 'specif[y] how the money should be spent.' " *Id.* at 216 (O'Connor, J., dissenting) (quoting Br. for Nat'l Conf. Amici Curiae). " 'A requirement that is not such a specification is not a condition, but a regulation, which is valid only if it falls within one of Congress' delegated regulatory powers.' " *Id.* Indeed, she warns,

> [i]f the spending power is to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives "power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed." *United*

 The petitioners rely on the Spending Clause as a source of congressional authority to enact 23 U.S.C. § 409. In *Martinolich*, 532 So. 2d 435, the Louisiana Court of Appeals applied the *Dole* Court's four-part test and concluded that § 409 was authorized under the Spending Clause:

> A state's regulation of its court system is in our opinion as fundamental a function of its sovereignty as the normal exercise of its police power even in matters concerning the health and safety of its citizens. Congress' intrusion, in this instance, however, is constitutionally permissible because Louisiana's participation in the federal funding scheme is voluntary; because the improvement of state highways with federal funds is in pursuit of "[providing] for the general welfare" as provided in U.S. Const. Art. I, § 8, cl. 1 ("spending power"); because it is clear that participation in the funding program requires acquiescence to the intrusion; and, finally, because the intrusion is related to a valid federal interest (inasmuch as 23 U.S.C. § 409 encourages participation in a scheme that ensures, by prioritization, deliberative spending of federal funds).

*Martinolich*, 532 So. 2d at 438 (citing *Dole*, 483 U.S. at 207-08). The *Martinolich* court, though, was asked to analyze Congress' power to enact 23 U.S.C. § 409 in its *pre*-1995 form, when by its own terms the privilege applied only to materials specifically *"compiled,"* or created, pursuant to §§ 130, 144, and 152. The connection to a federal purpose was therefore clear: *but for* the federal mandates, such materials would not exist. Here, by contrast, we must decide whether the Spending Clause authorizes Congress to bar state courts from permitting discovery of accident reports and other traffic and accident materials and data prepared for state and local purposes, simply because those publicly held materials are *also* "collected" and used for federal purposes. We conclude that it does not.

While the Spending Clause entitles Congress to offer

---

*States* v. *Butler*, [297 U.S.] at 78. This, of course, as *Butler* held, was not the Framers' plan and it is not the meaning of the Spending Clause.

*Id.* at 217 (O'Connor, J., dissenting).

states the option of accepting federal funds "with strings attached"—even when those "strings" interfere with the basic functioning of state government, as they do here—the United States Supreme Court has made it clear that Congress may do so only if those "strings" are also firmly "attached" to a legitimate federal interest in a specific federal project or program. *See Dole*, 483 U.S. at 208.[35] We find that no valid federal interest in the operation of the federal safety enhancement program is reasonably served by barring the admissibility and discovery in state court of accident reports and other traffic and accident materials and "raw data" that were originally prepared for routine state and local purposes, simply because they are "collected" for, *among other reasons*, federal purposes pursuant to a federal statute.

(2) <u>Commerce Clause:</u> Congress has authority "[t]o regulate commerce . . . among the several states." U.S. CONST. art. I, § 8, cl. 3. The United States Supreme Court has repeatedly redefined the limits of that power as our Nation has developed. *United States v. Lopez*, 514 U.S. 549, 552-57, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995).

In *National League of Cities v. Usery*, 426 U.S. 833, 96 S. Ct. 2465, 49 L. Ed. 2d 245 (1976), the Court found that Congress lacked Commerce Clause authority to apply the Fair Labor Standards Act's federal minimum wage and maximum hour provisions to state and local government employees, because the law effectively displaced state authority in "areas of traditional governmental functions." *Id.* at 852. The Court explained:

> If Congress may withdraw from the States the authority to make those fundamental employment decisions upon which

---

[35] While 23 U.S.C. § 145 "protect[s] state sovereignty," *see* 23 U.S.C. § 145(a) ("The authorization of the appropriation of Federal funds or their availability for expenditure under this chapter shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed."), the federal mandates at issue *here* do not appear to be similarly discretionary. *See* 23 U.S.C. § 152(a)(1) ("Each State shall conduct and systematically maintain [a survey of all public roads, etc.] . . . ."); 23 U.S.C. § 409 ("Notwithstanding any other provision of law . . . , [identified materials] shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes[.]").

their systems for performance of these functions must rest, we think there would be little left of the States' " 'separate and independent existence.' " *Coyle*[ *v. Smith*, 221 U.S. 559, 580, 31 S. Ct. 688, 695, 55 L. Ed. 853 (1911)]. . . . Congress has sought to wield its power in a fashion that would impair the States' "ability to function effectively in a federal system," *Fry*[ *v. United States*, 421 U.S. 542, 547 n.7, 95 S. Ct. 1792, 1795, 44 L. Ed. 2d 363 (1975)]. This exercise of congressional authority does not comport with the federal system of government embodied in the Constitution. We hold that insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3.

*Id.* at 851-52.[36]

Less than a decade later, in a 5-4 majority opinion, the Court overturned *National League of Cities* as "unsound in principle and unworkable in practice." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985).

[T]he fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the "States as States" is one of process rather than one of result. Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a "sacred province of state autonomy."

---

[36] Notably, the following year in *Patterson v. New York*, 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), the Court indicated that it thought that internal state court procedures such as the determination of evidentiary rules deserved deference under the federalist framework as an area traditionally regulated by states:

[W]e should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. Among other things, it is normally "within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion."

*Id.* at 201 (quoting *Speiser v. Randall*, 357 U.S. 513, 523, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958); *Leland v. Oregon*, 343 U.S. 790, 798, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952); *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S. Ct. 330, 78 L. Ed. 674 (1934)).

*Id.* at 554 (quoting *Equal Employment Opportunity Comm'n v. Wyoming*, 460 U.S. 226, 236, 103 S. Ct. 1054, 7-5 L. Ed. 2d 18 (1983)). The *Garcia* Court thus embraced James Madison's faith that the federal government "will partake sufficiently of the spirit [of the States] to be disinclined to invade the rights of the individual States, or the prerogatives of their governments." THE FEDERALIST, No. 46, at 319 (James Madison) (Jacob E. Cooke ed., 1961).[37]

> [T]he principal and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides through state participation in federal governmental action. The political process ensures that [federal] laws that unduly burden the States will not be promulgated.

*Garcia*, 469 U.S. at 556.[38] Chief Justice Burger and Justices Powell, Rehnquist and O'Connor warned in dissent that the majority's decision "substantially alters the federal system embodied in the Constitution." *Id.* at 557 (Powell, J., dissenting). Although *Garcia* has not been formally overruled, its precedential authority has been fundamentally eroded by recent decisions such as *Lopez* and *Morrison*.

In *Hodel v. Indiana*, 452 U.S. 314, 101 S. Ct. 2376,

---

[37] Madison argued that fears of "ambitious encroachments of the Federal Government, on the authority of the State governments" were unjustified, since elected members of state and federal governments represented the people, and states would band together to combat any such encroachments just as Americans did to combat British tyranny in 1776. THE FEDERALIST PAPERS No. 46, *supra* at 320.

> Plans of resistance would be concerted. One spirit would animate and conduct the whole. The same combination in short would result from an apprehension of the federal, as was produced by the dread of a foreign yoke; and unless the projected innovations should be voluntarily renounced, the same appeal to a trial of force would be made in the one case, as was made in the other. But what degree of madness could ever drive the Federal Government to such an extremity?

*Id.*

[38] In 1990, the Missouri Supreme Court relied on *Garcia* to reject claims that 23 U.S.C. § 409 constituted an unconstitutional federal regulation of internal state court procedures. *Claspill*, 793 S.W.2d 139. The court held that, under *Garcia*, "states must depend on the national political process for their tenth amendment protections." *Id.* at 141. Since Missouri had not been "deprived of any right to participate in the national political process," *id.*, Claspill's federalism challenge failed.

69 L. Ed. 2d 40 (1981), a pre-*Garcia* case that does not appear to have been similarly undermined, the Court applied a nexus test to challenges to the reach of congressional authority via the Commerce Clause:

> A complex regulatory program such as established by the [Surface Mining] Act can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfied this test.

*Id.* at 329 n.17 (citing *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 262, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 303-04, 85 S. Ct. 377, 13 L. Ed. 2d 290 (1964)).

The Court applied the Commerce Clause nexus requirement more recently in *Lopez*.

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*Lopez*, 514 U.S. at 558-59 (citations omitted). The Court then examined the Gun-Free School Zones Act's official Commerce Clause *rationale*—that the presence of firearms around schools adversely affected the quality of education, thereby adversely affecting future interstate commerce— and concluded that the requisite nexus to interstate commerce activity was missing. *Id.* at 564-67.

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the

States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. . . . The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated . . . , and that there never will be a distinction between what is truly national and what is truly local . . . . This we are unwilling to do.

*Lopez*, 514 U.S. at 567-68.

The Court reiterated that same fundamental respect for state sovereignty in *Morrison*, where a provision of the Violence Against Women Act was declared unconstitutional for lack of a sufficient nexus to interstate commerce:

Petitioners' reasoning, moreover, will not limit Congress to regulating violence but may, as we suggested in *Lopez*, be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant. . . . Under our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace.

*Morrison*, 529 U.S. at 615-16. "The Constitution requires a distinction between what is truly national and what is truly local." *Id.* at 617-18.

▮▮ Here, Lakewood argues that Congress has the power under the Commerce Clause to regulate "Federal-aid road systems, which undoubtedly are channels and instrumentalities of interstate commerce, as well as road systems within this state that substantially affect interstate commerce." Lakewood's Opening Br. at 16. For support, the City cites 23 U.S.C. § 101(b):

It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including The Dwight D. Eisenhower System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

. . . .

It is further declared that since the Interstate System is now in the final phase of completion it shall be the national policy that increased emphasis be placed on the construction and reconstruction of the other Federal-aid systems in accordance with the first paragraph of this subsection [quoted above], in order to bring all of the Federal-aid systems up to standards and to increase the safety of these systems to the maximum extent.

23 U.S.C. § 101(b). Certainly, a sufficient nexus exists between interstate commerce and the Federal-aid highway system to justify the "regulatory scheme when considered as a whole." *Hodel*, 452 U.S. at 329 n.17.

However, under *Hodel*, we must also determine whether the "challenged provisions are an integral part of the regulatory program." *Id.* As discussed above, § 409 in its pre-1995 form was evidently designed to *promote administrative candor* in the application for, and implementation of, federal safety enhancement funds, *Coniker*, 695 N.Y.S.2d at 495; *Robertson*, 954 F.2d at 1435, and to prevent federal mandates "from providing an *additional*, virtually no-work tool, for direct use in private litigation." *Light*, 560 N.Y.S.2d at 965 (emphasis added). It is therefore entirely reasonable that the privilege should cover "reports," "surveys," "schedules," "lists" and "data" that would not exist *but for* 23 U.S.C. §§ 130, 144, and 152. *See Yarnell*, 890 P.2d at 614. However, we fail to see how those vital federal purposes are reasonably served by also barring the discovery and admissibility in state court of routinely prepared state and local traffic and accident materials and data that would exist even had a federal safety enhancement program never been created, such as collision photographs, traffic counts, citizen complaint letters, and "raw data" relating to the history of a local traffic intersection. Such a broad privilege lacks the requisite nexus to § 409's raison d'etre and cannot reasonably be characterized as an "integral part" of the Federal-aid highway system's regulation. *Hodel*, 452 U.S. at 329 n.17.

■ (3) <u>Necessary and Proper Clause:</u> Lastly, petitioners suggest that the 1995 amendment to § 409 was duly authorized by the Necessary and Proper Clause, which gives Congress the authority to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers." U.S. CONST. art. I, § 8, cl. 18. In his concurrence in *Heart of Atlanta Motel, Inc.*, 379 U.S. 241, Justice Black explained that

> it has long been held that the Necessary and Proper Clause, Art. I, § 8, cl. 18, adds to the commerce power of Congress the power to regulate local instrumentalities operating within a single State if their activities burden the flow of commerce among the States.

379 U.S. at 271.

Pierce County claims that Congress had the power to amend § 409 as it did in 1995, "because, in order to encourage states to identify roads in need of Hazard Elimination funds, it deemed it necessary to protect raw data collected or compiled in making that evaluation from being used against municipalities in highway accident litigation." Pierce County's Suppl. Br. (*Guillen*) at 12. But while the federal government enjoys authority to require state courts to enforce a federal privilege protecting materials that would not have been created but-for federal mandates such as those in §§ 130, 144, and 152, we conclude that it was neither "necessary" nor "proper" for Congress in 1995 to extend that privilege to traffic and accident materials and raw data created and collected for state and local purposes, simply because they are *also* collected and used for federal purposes.[39]

■ Unconstitutional Violation of State Sovereignty: While Congress was authorized under its enumerated powers to enact 23 U.S.C. § 409 in its *pre*-1995 form, we find

---

[39] *See also Printz*, 521 U.S. at 923-24 (holding that the Necessary and Proper Clause cannot be used to justify a federal law that "violates the principle of state sovereignty").

that its 1995 amendment of that statute cannot be characterized as a valid exercise of any power constitutionally delegated to the federal government. Absent a valid and compelling federal interest, which petitioners have not identified here, Congress fundamentally lacks authority to intrude upon state sovereignty by barring state and local courts from admitting into evidence or allowing pretrial discovery of routinely created traffic and accident related materials and "raw data" created and held by state and local governments and essential to the proper adjudication of claims brought under state and local law, simply because such collections *also* serve federal purposes. *See Tardy*, 659 N.E.2d at 820; *Kitts*, 152 F.R.D. at 81. As most state courts recognized shortly after Congress enacted § 409 in 1987, applying the § 409 privilege to any and all materials and "raw data" being *collected* by state and local agencies "for the purpose of identifying . . . potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to §§ 130, 144, and 152" would have the unacceptable effect of "sacrific[ing] the state tort scheme on the altar of the federal statutory scheme." *Yarnell*, 890 P.2d at 613. We conclude that Congress' 1995 amendment to § 409 was unconstitutional and is thus unenforceable. *See Morrison*, 529 U.S. at 607-08.

We therefore hold that the federal privilege created by § 409 lawfully applies only to "reports," "surveys," "schedules," "lists" and "data" that are *originally* "compiled"—i.e., created, composed, recorded—for the *specific* purpose of

> identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title, or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds.

23 U.S.C. § 409; *see Yarnell*, 890 P.2d at 614. In other words, the privilege covers only:

(1) surveys to identify hazardous railroad crossings and improve them (§ 130); (2) applications for federal assistance in replacing or rehabilitating highway bridges (§ 144); (3) studies assigning priorities and schedules of projects for highway improvement (§ 152); and, (4) other compilations made for developing highway safety construction projects which would utilize Federal-aid funds (§ 409).

*Wiedeman*, 627 So. 2d at 173.

If this state court has misconstrued the United States Constitution's limitations upon the federal government's power to intrude upon the exercise of state sovereignty in so fundamental an area of law as the determination by state and local courts of the discoverability and admissibility of state and local materials and data relating to traffic and accidents on state and local roads, we are confident that the United States Supreme Court will so instruct, as is its constitutional role under our federalist system of government. As James Madison explained shortly prior to the United States Constitution's ratification:

> It is true that in controversies relating to the boundary between the two jurisdictions [i.e., state and federal], the tribunal which is ultimately to decide, is to be established under the general [i.e., federal] Government. But this does not change the principle of the case. The decision is to be impartially made, according to the rules of the Constitution; and all the usual and most effectual precautions are taken to secure this impartiality.

THE FEDERALIST No. 39, at 256 (James Madison) (Jacob E. Cooke ed., 1961).

## IV

■ Lastly, we agree with the Court of Appeals that Guillen is entitled to attorney fees under RCW 42-.17.340(4), since the record suggests that he was entitled to at least four of the five items to which he was denied access in his PDA case. *Guillen*, 96 Wn. App. at 874.

## CONCLUSION

While RCW 46.52.080 bars Guillen from securing public disclosure of accident reports prepared by persons involved in prior accidents at the same intersection, the statute does not prohibit their pretrial discovery. Moreover, only publicly held materials and data that were originally *created* for the identification, evaluation, planning, or development of federally funded safety enhancement projects under 23 U.S.C. §§ 130, 144, or 152 are lawfully privileged under 23 U.S.C. § 409, and thus also exempt from public disclosure under RCW 42.17.310(1)(j). Because the record contains insufficient facts to apply this standard to all of the disputed items, we vacate the lower courts' rulings and remand for supplementation of the record and further proceedings not inconsistent with this opinion.

SMITH, SANDERS, and IRELAND, JJ., and GUY, J. Pro Tem., concur.

MADSEN, J. (concurring) — Privileges are the exception, not the rule, and therefore, they are "not lightly created nor expansively construed, for they are in derogation of the search for the truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974). Today our court sidesteps this admonition and construes 23 U.S.C. § 409 in a sweeping manner, far beyond that intended and, most importantly, dictated by Congress. While I concur in the result of the majority, I do so only because the majority, not entirely comfortable with its own result, determined that *its own interpretation* of § 409 exceeds Congress' authority under the Tenth Amendment, and therefore, refused to enforce its own expansive interpretation.

In 1973, Congress enacted 23 U.S.C. § 152, which establishes a voluntary national funding program for enhancement of dangerous roadways, requiring states to identify hazardous locations and prioritize them for correction. 23 U.S.C. § 152. To thwart an unintended and unsavory result of § 152—that private plaintiffs might gain a work-free

"tool" to use in civil litigation—Congress enacted 23 U.S.C. § 409, which lies at the heart of this dispute. *See Coniker v. State*, 695 N.Y.S.2d 492, 181 Misc. 2d 801 (Ct. Cl. 1999).

Section 409 currently reads:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data *compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title* or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

23 U.S.C. § 409 (emphasis added). In 1995, Congress added the term "collected" to § 409, thus making inadmissible in court, those materials "compiled or collected" for purposes of § 152. Congress was clear in its intent regarding this amendment:

> This section amends section 409 of title 23 to clarify that data "collected" for safety reports or surveys shall not be subject to discovery or admitted into evidence in Federal or State court proceedings.
>
> This clarification is included in response to recent State court interpretations of the term "data compiled" in the current section 409 of title 23. It is intended that raw data collected prior to being made part of any formal or bound report shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mention[ed] or addressed in such data.

H.R. Rep. 104-246 § 328, at 59 (1995).

I agree with the majority that this amendment was intended to make a "change" in § 409. Majority at 702; *see Home Indem. Co. v. McClellan Motors, Inc.*, 77 Wn.2d 1, 3,

459 P.2d 389 (1969). However, I disagree with the majority as to the import of that change. Under the majority's holding, original police reports prepared for purposes unrelated to § 152, become privileged, even in the hands of the party that created them, once they have been "collected" by any entity for purposes of § 152. Majority at 723. Contrary to the majority's assertions, this was not the result intended by Congress, nor is it a holding dictated by any decisional law.

This point is easily shown by examining: (1) the well settled purpose behind § 409; (2) how state courts partially undermined that purpose prior the 1995 amendment; (3) how the 1995 amendment can be logically read to bring the interpretation of § 409 back in line with its purpose; and (4) what state courts have done since the amendment.

The purpose of § 409 is clear:

> The manifest Congressional intent in enacting 23 U.S.C. § 409 was to "foster the free flow of safety-related information by precluding the possibility that such information later would be admissible in civil suits. The interest to be served by such legislation is to obtain information with regard to the safety of roadways free from the fear of future tort actions" (*Perkins v. Ohio Dept. of Transportation,* 65 Ohio App.3d 487, 500, 584 N.E.2d 794, 802 [1989]; *see also Palacios v. Louisiana and Delta RR,* 740 So.2d 95 [La. 1999]; *Reichert v. State of Louisiana,* 694 So.2d 193 [La. 1997]). The statute has the dual effect of (1) facilitating candor in the evaluation of highway safety hazards, and (2) prohibiting federally required record keeping from being used as a tool by civil litigants (*see, Robertson v. Union Pacific RR Co.,* 954 F.2d 1433 (8th Cir.1992); *Stephens v. Town of Jonesboro,* 642 So.2d 274 [La. Ct. App. 1994]).

*Coniker,* 695 N.Y.S.2d at 494-95. This is distilled into one basic and obvious rule: Congress did not want to create a "virtually no-work, tool for direct use in private litigation," *Light v. State,* 560 N.Y.S.2d 962, 965, 149 Misc. 2d 75 (Ct. Cl. 1990). In essence, Congress did not want any party involved in litigation to be better off, or for that matter worse off, by reason of a State's participation in seeking § 152 funding.

State courts began to undermine this purpose by giving § 409 an unduly narrow construction. An examination of one of the leading state court opinions on the proper scope of § 409 during the period preceding the 1995 amendment shows the limited construction of § 409 that Congress was aiming to overturn by its amendment. *Wiedeman v. Dixie Elec. Membership Corp.*, 627 So. 2d 170 (La. 1993), *cert. denied*, 511 U.S. 1127 (1994), concerned a plaintiff's discovery requests to the State Department of Transportation and Development (DOTD). Plaintiffs sought information, such as accident reports, traffic counts, and other raw data collected by the department that was gathered by the DOTD in preparing its applications for federal funding. *Id.* Plaintiffs also sought surveys, compilations, and the actual applications for federal funding.

The Louisiana Supreme Court held that the raw data and reports gathered by the DOTD, which were later incorporated into a report, were not privileged by reason of § 409:

> DOTD argues for an even more expansive interpretation that would protect data and raw facts as well as the written documents incorporating the data. DOTD essentially asks this Court to transform a statute, which by its literal wording protects information *compiled* for certain purposes, into one which protects all information in DOTD's possession. We refuse. The word "compiled" indicates that information is collected into one document or composed from other sources. [See *Webster's New Collegiate Dictionary* p. 230, (1977).] The term suggests an end product, something more than unedited factual material. . . . Section 409 creates a privilege for compilations enumerated in the statute, but the privilege does not extend to reports and data gathered for or incorporated into such compilations.
>
> . . . A rule which requires DOTD to divulge source data but not the end product fosters candor by shielding the state's self-critical evaluations and conclusions from outside scrutiny. It also accords with Louisiana's strong interest in fully and fairly adjudicating matters before its courts and the concomitant need to facilitate open and evenhanded development of the facts underlying a dispute.

*Wiedeman*, 627 So. 2d at 173 (emphasis added). Other state courts construed § 409 in a similar fashion during this period. *See Tardy v. Norfolk S. Corp.*, 103 Ohio App. 3d 372, 659 N.E.2d 817 (1995); *S. Pac. Transp. Co. v. Yarnell*, 181 Ariz. 316, 890 P.2d 611, *cert. denied*, 516 U.S. 937 (1995).

In *Wiedeman*, and other similar cases, plaintiffs were attempting to gain information that was "collected" by an agency for purposes of preparing an application for federal funding from the agency that "collected" the information. In none of these cases were plaintiffs seeking information or reports from their original source, such as accident reports from a law enforcement agency. This is a critical distinction, and one that is unnecessarily dismissed as inconsequential by the majority. As illustrated below, it is a distinction that makes sense.

When Congress amended § 409 to include within its scope information that was "collected" it was reacting to decisions like *Wiedeman*. Congress simply "intended that raw data collected prior to being made part of any formal or bound report shall not be subject to discovery or admitted into evidence." H.R. REP. 104-246 § 328. However, this did not obviate the express statutory requirement that the raw data and information be "collected" pursuant to § 152.

An example illustrates this point, and the flaw in the majority's analysis. Take the simple case of a Pierce County Sheriff's Department officer completing a written accident report for a valid law enforcement purpose (e.g., documenting why a citation was given or an arrest made), a duty regularly performed long before 1973, the year § 152 was originally enacted. Pub. L. No. 100-17, Title I, § 132(a), 101 Stat. 170 (Apr. 2, 1987); *see* RCW 46.52.060 and accompanying historical information. This report, and others like it, might contain myriad relevant information for a plaintiff pursuing a negligent traffic design claim against the government.

Now, let us assume that these reports are kept on microfiche, and several years later the Pierce County Engineer's Office begins "collecting" copies of these reports, but does not make them "part of any formal or bound report." *See* H.R. REP. 104-246 § 328. Under § 409, as amended, a plaintiff would not be entitled to have access to the actual documents "collected" by the Pierce County Engineer's Office. Indeed, this would provide a "virtually no-work, tool for direct use in private litigation," *Light*, 560 N.Y.S.2d at 965, as a litigant would be able to obtain a collection of reports that is part of a work in progress. However, to say that a litigant would not have access to the original reports, still contained on microfiche, from Pierce County is an entirely different matter.

By preventing a litigant from gaining access to information that has been "collected" for purposes of securing federal funding, Congress has made the litigant no better off than they would have been had the State not participated in the funding program, which is the obvious goal of § 409. However, if, as the majority suggests, Congress has prevented a litigant from having access to original reports from their original sources, prepared for purposes unrelated to securing federal funding, then a litigant would be in a far worse position than if the State did not participate in the funding program. I do not believe that was the result intended by Congress, nor do I believe it is dictated by the language of § 409.

No post-1995 amendment case involves the discovery of original reports from the agency creating them for purposes unrelated to the securing of federal funding. Instead, each involves an attempt to gather information already collected or prepared by a state agency, from the agency that "collected" the information for the purpose of securing § 152 funds. *See, e.g., Reichert v. Dep't of Transp. & Dev.*, 694 So. 2d 193 (La. 1997) (discovery request to DOTD for documents collected by DOTD); *Mackie v. Grand Trunk W. R.R.*, 215 Mich. App. 20, 544 N.W.2d 709 (1996) (involving "Grade Crossing Report" compiled by Michigan Department of

Transportation; decided under pre-amended version of § 409). Not surprisingly, in each instance courts have reached the conclusion that the "collected" information is privileged:

> On November 28, 1995 section 409 was amended to include the words "or collected" after "compiled" to effectively eliminate the admissibility of "[a]ccident reports, traffic counts, and other raw data *collected by the Department*" allowed by the holding in *Wiedeman. Id.* This clarification was added in response to recent State court decisions, like *Wiedeman,* that in the view of Congress, misinterpreted the term "data compiled." . . . In other words, such information is *collected* or compiled to protect the public by ensuring that safety measures are routinely explored by DOTD without exposing their efforts.

*Reichert*, 694 So. 2d at 198 (emphasis added).

A narrow construction of § 409 is also supported by several rules of statutory interpretation. The first is that there is a strong presumption against federal preemption, requiring a showing that this is "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947). Second, privileges are to be narrowly construed, as they stand in "derogation of the search for truth." *Nixon*, 418 U.S. at 710; *see Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980).

Finally, this Court should be mindful that "where a statute is susceptible of more than one interpretation, some of which may render it unconstitutional, the court will adopt a construction which sustains the statute's constitutionality, if at all possible." *State ex rel. Faulk v. CSG Job Ctr.*, 117 Wn.2d 493, 500, 816 P.2d 725 (1991). The majority holds that Congress does not have the authority, as a result of the Tenth Amendment, to enact a provision as sweeping as the majority believes § 409 and its subsequent amendment were intended to be. Specifically, the majority states:

> While Congress was authorized under its enumerated powers to enact 23 U.S.C. § 409 in its *pre*-1995 form, we find that its 1995 amendment of that statute cannot be characterized as a

valid exercise of any power constitutionally delegated to the federal government.

Majority at 743-44. Of course, the interpretation of § 409 that I propose does not run afoul of the Tenth Amendment, as is all but conceded by the majority, since it is a clearly valid exercise of the Federal Spending Power. *Id.* at 736-37; *see Martinolich v. S. Pac. Transp. Co.*, 532 So. 2d 435, 438 (La. Ct. App. 1988); *Claspill v. Mo. Pac. R.R.*, 793 S.W.2d 139 (Mo.), *cert. denied*, 498 U.S. 984 (1990); *South Dakota v. Dole*, 483 U.S. 203, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987).

Because the record before this Court does not permit us to accurately determine whether the disputed documents would be privileged under the correct interpretation of § 409, like the majority, I would remand for further proceedings.

ALEXANDER, C.J., and JOHNSON, J., concur with MADSEN, J.

After modification, further reconsideration denied November 27, 2001.