Cindy R. RODENBECK, Individually and as Personal Representative of the Estate of James C. Rodenbeck, deceased, Plaintiff,

v.

NORFOLK & WESTERN RAILWAY COMPANY, Defendant.

No. 1:96–CV–378.

United States District Court, N.D. Indiana, Fort Wayne Division.

June 6, 1997.

---

Robert L. Thompson, Hoffman Thompson Skekloff Rogers and McNagny, Fort Wayne, IN, for Plaintiff.

John C. Duffey, Elizabeth B. Searle, Stuart and Branigin, Lafayette, IN, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] on the motion of the Defendant Norfolk and Western Railway Company ("NW"), filed April 24, 1997. NW seeks a protective order and a motion in limine concerning evidence, testimony and opinions relating to certain correspondence (the "Etzler–DeLaCroix correspondence") produced to the Plaintiff by a third-party during discovery regarding a certain railroad grade crossing in Allen County, Indiana, the subject of this lawsuit. (*See* Def. Exhs. A–E.)

On May 8, 1997 the Plaintiff, Cindy R. Rodenbeck ("the Plaintiff"), individually and as personal representative of the Estate of James C. Rodenbeck ("Rodenbeck"), deceased, filed a brief in opposition.

On May 21, 1997, NW replied.

This Court has jurisdiction based on diversity. *See* 28 U.S.C. § 1332.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On June 9, 1995, Rodenbeck was driving a truck eastbound on Notestine Road. Notestine Road intersects with NW's single mainline track at a grade crossing marked with cross-buck yield signs and advance railroad warning signs. Rodenbeck allegedly failed to yield to the southbound train at the grade crossing and was struck by the train.

Approximately two years before, the Federal Railway Administration ("FRA") and the Federal Highway Administration ("FHWA") had distributed *The Highway and Rail Safety Newsletter*. (*See* Def. Exh. A.) This document discussed changes in federal regulations concerning the installation of STOP and YIELD signs at grade crossings and included factors to consider in selecting and identifying grade crossings that might warrant

STOP signs. The newsletter encouraged railroads to cooperate with states, communities and federal agencies on the selection of grade crossings for the installation of such signs.

On May 9, 1994, a NW Vice–President, Clifford DeLaCroix ("DeLaCroix"), corresponded with the Executive Director of the Allen County Highway Department, William Etzler ("Etzler"), regarding these guidelines. DeLaCroix supplied Etzler with a list of NW grade crossings in Allen County that might qualify for STOP signs under the guidelines, including Notestine Road. (*See* Def. Exh. B.) NW then offered to pay half the cost of installing the STOP signs. (*Id.*) On May 16, 1994, Etzler responded that he would review the matter. (*See* Def. Exh. C.) Over a year later, on July 11, 1995, DeLaCroix contacted Jack McComb ("McComb"), President of the Allen County Commissioners, to again raise the possibility of installing STOP signs, and also advised him of NW's relatively positive experience at crossings equipped with such signs. (*See* Def. Exh. D.) Notably, he pointed out that the "overall number of collisions at all [NW] crossings in Indiana in the first four months of 1995 [showed] a 28.7% decrease from a similar period in 1994." (*Id.*) In his opinion, this decrease was "directly related to the number of stop signs" that had been installed in the twenty counties and eleven municipalities that had responded to the 1994 newsletter discussed *supra*.

On August 1, 1995, Etzler, apparently speaking for Allen County, rejected NW's offer on the grounds that it was "woefully inadequate considering the liability Allen County would assume from installation of stop signs." (*See* Def. Exh. E.) Instead, Etzler suggested that NW install "signalized crossings" on a shared basis with Allen County. (*Id.*)

NW has now moved for an order in limine to prevent the Plaintiff from admitting as evidence, or otherwise referring to, any of the Etzler–DeLaCroix correspondence (including the one letter between DeLaCroix and McComb) in the trial of this action. It

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

also seeks a protective order under Fed. R.Civ.P. 26(c) and 23 U.S.C. § 409 ("§ 409") prohibiting any further discovery regarding or based on that correspondence, whether it be factual testimony or expert opinions.

In support of its motion, NW argues that § 409 provides protection against the discovery and admissibility of documents that, in part, identify and plan grade-crossing safety enhancements:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying[,] evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

23 U.S.C. § 409 (footnote omitted).

In response, the Plaintiff argues that § 409 must be construed restrictively. In so doing, she indicates that the documents were supplied to her counsel in response to a discovery request directed to the Allen County Highway Department ("ACHD") and the Indiana Highway Department of Transportation ("INDOT"), even though both entities withheld other documents that they believed properly fell within the protection of § 409. Ultimately, the Plaintiff observes that the Notestine Road grade crossing was approved for the installation of flashing warning signals under the Transportation Improvement Program ("TIP") of the Federal Highway Administration ("FHA") and thus concedes that discovery of information compiled in connection with that determination is barred. However, she contends that the Etzler–DeLaCroix correspondence had no relation to either the TIP; 23 U.S.C. §§ 130, 144 or 152; or, any improvements that might be accom-

plished with federal funds. Moreover, in her view, the correspondence simply does not contain any "reports, surveys, schedules, lists or data compiled or collected" in connection with a federally funded program or project, so as to deserve § 409 protection. At bottom, however, the Plaintiff characterizes the DeLaCroix proposal to Allen County as one independent of any federal program. Indeed, the Plaintiff argues that NW was actually attempting to induce Allen County to enter into an improper sign-placement program at its passive railroad crossings in violation of federal guidelines, without approval of either INDOT or the FHA, and without federal financing.

The Plaintiff also somewhat generally argues that to apply § 409 in this case would needlessly sacrifice Indiana's tort scheme well beyond the contemplation of the United States Supreme Court in *CSX Trans. Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Finally, the Plaintiff urges that if there are any unresolved factual questions surrounding the subject correspondence, NW's motion is premature.

In reply, NW argues that the Etzler–DeLaCroix correspondence falls within the scope of § 409 because it relates to a proposal that could have been accomplished with federal funds. Moreover, NW contends that merely because either INDOT, or the ACHD, turned over the Etzler–DeLaCroix correspondence in response to a discovery request does not mean that it was *per se* discoverable.

Primarily, of course, NW argues that the Etzler–DeLaCroix correspondence was produced to develop a highway-rail construction project (regardless of whether it was approved or completed), and that in general it presents the very type of candid communications that are intended for exemption from discovery, and admissibility at trial, under § 409. NW also argues that the protection provided by § 409 is not merely limited to documents created pursuant to §§ 130, 144 and 152, but also extends to documents that relate to the development of any highway improvement or safety project that may implement federal funds. Thus, NW argues that it does not need to fit the Etzler–DeLa-

Croix correspondence into a §§ 130, 144 or 152 pigeon-hole to receive § 409 protection, but only needs to show that the project could have conceivably been federally funded. In short, as NW sees it, because the correspondence obviously related to the possible identification, evaluation and planning of safety enhancements at a highway-rail crossing, it falls within § 409. Finally, NW rejects the notion that its motion is premature.

## III. DISCUSSION

■ The question before the Court is whether the Etzler–DeLaCroix correspondence falls within the plain language of § 409. This inquiry is important because the Seventh Circuit in *Harrison v. Burlington Northern RR Co.*, 965 F.2d 155 (7th Cir. 1992), held that § 409:

> [w]ithdraws the broad latitude of discretion ordinarily allowed judges in evidentiary matters and bars the reception of evidence as it states that the "reports, surveys, schedules, lists or data" within the statute "shall not be admitted into evidence in federal or state court or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists or data."

*Id.* at 159; *see also Shots v. CSX Trans., Inc.*, 887 F.Supp. 204, 205 (S.D.Ind.1995) (noting that since *Harrison*, the statute was amended to extend to discovery).

At the same time, the Seventh Circuit held that § 409 extends to any projects that could have conceivably been financed by federal funds. *Harrison*, 965 F.2d at 160; *Shots*, 887 F.Supp. at 205. Moreover, § 409 encompasses not only grade crossing safety enhancement documents, but also any testimony about those documents. *Id.*

The ostensible basis for § 409 is to "facilitate candor in administrative evaluations of highway safety hazards," and to prohibit federally required record-keeping from being used as a "tool ... in private litigation." *Harrison*, 965 F.2d at 160 (citing *Robertson v. Union Pacific RR Co.*, 954 F.2d 1433, 1435 (8th Cir.1992)). Thus, simply put, if the Etzler–DeLaCroix correspondence falls within

§ 409's rather expansive scope, then NW's motion must be granted.

Here, the administrators of the FHWA and FRA developed guidelines to identify grade crossings which might qualify for the installation of STOP signs. This guidance later became the subject of *The Highway and Rail Safety Newsletter*, which encouraged FHWA and FRA regional directors to work with the various states, communities and railroads on the possible installation of appropriate safety signage. This communication led to the Etzler–DeLaCroix correspondence concerning the identification and evaluation of railroad grade crossings in Allen County that might qualify for STOP signs under the guidelines suggested by the FHWA and FRA.

In initiating the correspondence, DeLaCroix attached a list of crossings in Allen County, including Notestine Road, that in his opinion qualified for STOP signs under the FHWA/FRA guidelines. (*See* Def. Exh. B.) Later, in a further effort to assist in the evaluation of the efficacy of these safety enhancements, DeLaCroix advised the Allen County Commissioners that it had been the recent experience of NW that the installation of STOP signs had resulted in a reduction in collisions at grade crossings in the State of Indiana. (*See* Def. Exh. D.)

■ Notably, § 409 expressly shields for evidentiary and discovery purposes certain information pertaining to grade crossing construction improvement projects that fall under either 23 U.S.C. § 130, or "which may be implemented utilizing Federal-aid highway funds...." This latter point is significant because the installation of STOP signs at Notestine Road became eligible for federal funding after the 1992 amendment to the Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD"). More specifically, the installation of traffic control devices in accordance with the MUTCD at highway-rail grade crossings is eligible for federal funding under 23 C.F.R. § 655.607 since such a project involves "construction," as that term is defined by 23

U.S.C. § 101(a).[2] In addition, Notestine Road would also have fallen under the provisions of 23 U.S.C. § 130(a) given its provision that "the entire cost of construction [as defined in 23 U.S.C. § 101(a)] of projects for the elimination of hazards of railway-highway crossings ... may be paid from [federal funds]." Thus, under either provision of § 409, it is certainly "conceivable" that the placement of STOP signs at the Notestine Road grade crossing would have qualified for federal funding. (See Def. Exh. B); *Harrison*, 965 F.2d at 160. Indeed, such a reading underscores the premium placed on ensuring a candid assessment of grade crossing safety issues. 965 F.2d at 156 n. 3.

■ Nevertheless, while STOP signage was eligible for federal funding, NW still had to deal with the ACHD since it was within Allen County's discretion (*see* Def. Exh. A Attachment 1) whether STOP signs should be installed at Notestine Road. (*See* 23 U.S.C. § 402; Def. Exh. R.) Thus, if NW wanted to place STOP signs at Notestine Road, it was required to not only cooperate with the ACHD, but also to establish the need for those signs prior to any submission to INDOT. (*See* Def. Exh. B.) Indeed, this purpose was the thrust of the correspondence at issue, to provide "data" for the purpose of "identifying, evaluating or planning" a proposed safety enhancement[3]

Moreover, the mere fact that the ACHD did not accept NW's suggestion does not mean that the Etzler–DeLaCroix correspondence does not fall within § 409. Indeed, the language of § 409 is not limited in any way to only approved or completed plans; to hold otherwise would chill the candor that is expected in administrative evaluations of highway safety standards-a recognized danger that § 409 was designed to cure. *See Harri-*

*son*, 965 F.2d at 160. It would also mean that the operative effect of § 409 would turn on the discretionary determinations of various local agencies, none of whom are likely to be mindful of the policy dictates of § 409.[4]

At bottom then, the Etzler–DeLaCroix correspondence was generated in a candid effort to assess the efficacy of STOP signs at Notestine Road and other locations throughout Allen County. Thus, these documents, and the anticipated testimony, certainly fall within the intent of § 409–to facilitate candor in administrative evaluations of highway safety standards. *Id.* If a railroad knows that its candid efforts of persuasion directed to a local government that possesses discretionary authority may ultimately be used against it, the railroad will be far less forthcoming in offering any "data" by which that discretion can be exercised, and indeed may choose not to offer safety suggestions at all.

■ Finally, the Plaintiff seemingly argues that § 409 should only apply when there is *Easterwood*-type preemption, (*see* Resp. Br. at 12); and, that to apply § 409 where *Easterwood* does not apply would inappropriately transgress upon Indiana's tort scheme. *Easterwood* preemption occurs when a federal statute has established a standard of care in conjunction with the expenditure of federal funds. 507 U.S. at 670–72, 113 S.Ct. at 1741. On the other hand, § 409 applies regardless of the actual expenditure of federal funds, and indeed, as discussed *supra*, seeks to dictate the admissibility and discoverability of documents authored solely in the interest of developing safety enhancement projects-events that frequently occur, as they did here, well before the expenditure of any federal funds.

---

**2.** 23 U.S.C. § 101(a) defines the term "construction" in pertinent part as: "[A]ll expenses incidental to the construction or reconstruction of a highway, including ... elimination of hazards of rail grade crossings ... and improvements which directly facilitate and control traffic flow...."

**3.** "Data" is defined as: "Information, especially information organized for analysis or used as the basis for a decision." *The American Heritage Dictionary of the English Language* (Family Edition 1979). The mere fact that the "data" was in

the form of correspondence does not mean that it deserves less protection.

**4.** The Plaintiff also argues that, in her considered view, Notestine Road did not qualify for Stop signs under the factors catalogued by the FRA and FHWA. (*See* Def. Exh. A.) However, her conclusion carries no weight in this argument because the discretion of Allen County was paramount, and many factors (not just the single contraindicator upon which Plaintiff focuses) needed to be considered.

Finally, if unresolved questions of fact exist, rendering the motion premature, they have not been disclosed. Therefore, the motion will be granted.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion is hereby GRANTED. However, the Court's ruling is not intended to preclude testimony, expert or otherwise, as to the general efficacy of placing STOP signs at Notestine Road, or the effect they would have had if they had been installed. Such evidence, to the extent deemed admissible, however, must come from sources apart from the Etzler–DeLaCroix correspondence.