862 So.2d 149 (2003)
James W. LONG, et al., Plaintiff-Appellee,
v.
STATE of Louisiana, THROUGH THE DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 37,422-CA.
Court of Appeal of Louisiana, Second Circuit.
November 24, 2003.
Rehearing Denied January 22, 2004.
*151 Louisiana Department of Justice, by William E. Crawford, Jr., James R. Dawson, Baton Rouge, for Appellant.
Richard L. Fewell, Jr., West Monroe, for Appellee.
Before WILLIAMS, PEATROSS and DREW, JJ.
WILLIAMS, Judge.
The defendant, Louisiana Department of Transportation & Development (DOTD), appeals a judgment in favor of the plaintiffs, James Long, Christopher Long and Jamie Long Coley. After a trial, the jury assessed 60% fault to DOTD in causing the fatal automobile/train collision, 20% fault to decedent, Betty Long, 10% fault to the Village of Bonita and 10% to Union Pacific Railroad. The jury awarded plaintiffs survival and wrongful death damages. For the following reasons, we affirm.

FACTS
On September 10, 1997, at a railway crossing on Harp Street in the Village of Bonita, Louisiana, a Union Pacific train struck an automobile driven by Betty Long, who died as a result of injuries sustained in the collision. Her husband, James Long, her adult daughter, Jamie Long Coley, and her minor son, Christopher Long, brought wrongful death and survival actions against the defendant, DOTD.
Plaintiffs alleged that the DOTD had assumed a duty two years earlier to signalize the crossing, but negligently breached this duty in failing to erect adequate warning devices at the crossing. In support of this allegation, plaintiffs presented to the court correspondence between Mayor Michael J. Lytle of Bonita and the DOTD, consisting of three letters written in May and September 1995.
In the May 1995 letter, the mayor notified DOTD of a fatal collision at the Harp Street crossing the week before and stated, "The grade crossing is unmarked except for wooden crossbucks.... There have been two previous accidents at this crossing, one with a fatality in the last eight years. I believe that some additional warning is needed at this crossing...." In September 1995, DOTD responded that "the Department plans to signalize the railroad crossing from funds available through a federal safety program. In order to comply with Federal Highway Administration requirements, the local governing body must agree by letter or resolution to maintain both pavement striping and signs.... Upon receipt of your concurrence, the Department will proceed with the necessary steps to obtain approval from FHWA to complete the project." On September 13, 1995, Mayor Lytle responded that he had received DOTD's letter "stating your intention to signalize the above referenced railroad crossing. We understand our obligation to maintain the pavement striping and signs. By this letter we agree to maintain the pavement striping and signs."
In response to the petition, DOTD filed a motion to strike the letters from the record and a motion for summary judgment, which asserted that the Harp Street crossing was not part of the state highway *152 system and that DOTD was not responsible for maintenance of such "off-system" crossings. The motions asserted that DOTD's correspondence with Mayor Lytle was information collected solely due to DOTD's participation in the Federal Railway Upgrade Safety Program, 23 U.S.C. § 130, and was thus protected from discovery or admission into evidence pursuant to 23 U.S.C. § 409.
DOTD submitted affidavits from Steven Cumbaa, DOTD's construction services engineer, and William Shrewsberry, DOTD's administrator of the Federal Railroad Safety Program ("FRSP"). Cumbaa stated that the crossing was not part of the state highway system and Shrewsberry indicated that the only reason DOTD compiled information about the crossing was to comply with the FRSP.
The district court granted the motion to strike the correspondence from the record and granted DOTD's motion for summary judgment, dismissing plaintiffs' claims. This court reversed the summary judgment, finding that the district court improperly excluded the two September 1995 letters from evidence because they did not contain any information from reports, surveys or data concerning safety improvement of railway-highway crossings. We concluded that a material issue of fact existed regarding the issue of whether DOTD had assumed a duty to install warning signals at the crossing. Long v. State, DOTD, 32,124 (La.App.2d Cir.8/18/99), 743 So.2d 743.
Subsequently, DOTD filed a second motion to strike the letters and submitted a revised affidavit from Shrewsberry, who testified that the September 1995 letters were maintained as a necessary part of the process to upgrade the Harp Street crossing pursuant to DOTD's administration of the FRSP. The trial court denied the motion to strike. Prior to trial, the parties stipulated that at the time of the accident, the railroad crossing, tracks and crossbuck signs in place were owned and maintained by Union Pacific, the approaches to the Harp Street crossing and the existing stop signs were owned and maintained by the Village and that DOTD had never maintained the crossing.
After a trial, the jury found that DOTD was liable for the collision which resulted in the death of decedent and assessed 60% fault to DOTD, 20% fault to decedent, Betty Long, 10% fault to the Village of Bonita and 10% to Union Pacific Railroad. The jury awarded plaintiffs survival and wrongful death damages and the lost wages of decedent. After revising the jury's awards to conform with the statutory damages cap and the 40% comparative fault assessment, the trial court rendered judgment awarding damages of $131,578.75 for decedent's pain and suffering before death, $210,523.75 to decedent's husband, James Long, $78,948.75 to each of the children, Chris Long and Jamie Coley, and awarding $232,952 for decedent's lost wages. DOTD appeals the judgment.

DISCUSSION
DOTD contends the trial court erred in admitting into evidence the September 1995 letters between DOTD and the Village. DOTD argues that the correspondence concerned a proposed federally funded safety project at the Harp Street crossing and should have been excluded from evidence.
Under Louisiana law, parties may obtain discovery regarding any material not privileged which is relevant to the subject matter of the action. LSA-C.C.P. art. 1422. Evidence which is relevant is generally admissible. LSA-C.E. art. 402. With regard to certain highway safety information, *153 however, Louisiana's law is preempted by federal law. Wiedeman v. Dixie Electric Membership Corp., 627 So.2d 170 (La.1993).
23 U.S.C. § 409 provides that reports, surveys, schedules, lists or data compiled or collected for the purpose of identifying, evaluating or planning the safety enhancement of railway-highway crossings pursuant to the federal railroad safety program, or for developing any highway safety improvement project utilizing federal funds, shall not be subject to discovery or admitted into evidence in a federal or state court proceeding or in any action for damages arising from any occurrence at a location mentioned in such reports, surveys, schedules, lists or data. In Wiedeman, supra, the supreme court stated that since preemption is never presumed, Section 409 must be construed restrictively to prohibit only what is expressly proscribed.
In Reichert v. State, DOTD, 96-1419 (La.5/20/97), 694 So.2d 193, the court addressed the admissibility of four exhibits. Each of these exhibits contained or made reference to a report or study produced pursuant to the State's effort to obtain federal funds for safety improvements. The court concluded that the exhibits "reflect[ed] information collected and compiled by the DOTD in furtherance of potential highway safety projects that may have been supported by federal funds" and were, thus, inadmissible.
In Palacios v. Louisiana and Delta Railroad, Inc., 98-2932 (La.7/2/99), 740 So.2d 95, the supreme court stated that in cases involving railway crossing collisions, the protection of Section 409 will apply to: (1) reports, surveys, schedules, lists or data, (2) compiled or collected, (3) for the purpose of identifying, evaluating or planning the safety enhancement of railway-highway crossings, (4) pursuant to 23 U.S.C. § 130. Reviewing the September 1995 correspondence in light of the criteria and analysis set forth in Reichert and Palacios, this court in Long, supra previously concluded:
[T]he letter[s] ... contain no information restricted by the statute. Although the letter from the DOTD specifies that the federal government is the expected source of funds for the planned improvement, it makes no reference whatsoever to any "reports, surveys, schedules, lists, or data,"the only items "expressly proscribed" from admission or discovery. Palacios, supra; Wiedeman, supra. These letters are unlike the exhibits in Reichert which contained reports or data along with information about the DOTD's plans. Further, the letters contain no suggestion that the planned improvement was based on any of the restricted information. We, therefore, distinguish these letters from the contract involved in Stephens v. Town of Jonesboro, 25,715 (La.App.2d Cir.8/19/94), 642 So.2d 274, which contained "information relating to a highway safety construction improvement."
The September 1995 letters can also be distinguished from the documents at issue in Rodenbeck v. Norfolk & Western Railway Co., 982 F.Supp. 620 (N.D.Ind.1997). In that case, the correspondence between a railroad executive and county officials referred to a federal report regarding regulatory guidelines for the installation of stop signs at rail crossings and to statistical data indicating a decrease in collisions at crossings equipped with stop signs. A county official responded that installation of stop signs would increase the county's liability without providing adequate safety at the crossings listed and suggested instead that the railroad install warning signals. Thus, unlike the correspondence at issue in the present case, the letters in *154 Rodenbeck discussed safety-related reports, surveys and data.
In its brief, DOTD contends the letters should have been excluded from evidence because they were written to satisfy the requirements of the federal aid program and were included in DOTD's Harp Street crossing file, which was admitted into evidence as a sealed exhibit. However, not all documents in the state's possession will be privileged under Section 409 and protected from admissibility. Palacios, supra. The content of the document must be examined with regard to the provisions of the statute.
Based upon further review of the record and of the applicable statutory law and jurisprudence, we have not been presented with sufficient reason to alter this court's prior conclusion that the two letters at issue neither contain nor refer to the type of safety information which is precluded from evidence by the statute. Consequently, we cannot say the trial court erred in admitting the September 1995 letters into evidence. The assignment of error lacks merit.
Liability
The defendant contends the jury erred in assessing 60% fault to DOTD in causing the accident. Defendant argues it is not liable because the evidence showed that DOTD did not assume a duty to upgrade the crossing and that decedent caused the accident by failing to obey the stop sign.
In a proceeding against the State DOTD under either negligence or strict liability, the plaintiff must prove that (1) the thing was in the custody of DOTD, (2) the thing was defective because of an unreasonably dangerous condition, (3) DOTD possessed actual or constructive knowledge of the defect and failed to take corrective measures in a reasonable time, and (4) the defect was a cause of plaintiff's injuries. Netecke v. State, DOTD, 98-1182 (La.10/19/99), 747 So.2d 489. DOTD has a duty to maintain the public roadways in a reasonably safe condition for motorists exercising ordinary care. Netecke, supra. Once a duty is assumed, negligent breach of that duty may create liability. Long, supra.
A motorist approaching a railroad crossing has a heightened duty of care. The motorist must use her senses of sight and hearing for possible approaching trains. Wilkerson v. Kansas City Southern Railway, 33,922 (La.App.2d Cir.11/1/00), 772 So.2d 268.
In the present case, Lee Cleveland, the police chief of Bonita, testified that he investigated the scene of the accident. He stated that the decedent, Betty Long, had been ejected from her vehicle and was lying on the ground with obviously serious injuries. Cleveland noted in his report that there were no obstructions blocking the driver's view of the stop sign or the crossing. Cleveland reported that a witness stated that decedent had driven through the stop sign.
Danny McGrew, the Morehouse Parish Sheriff, testified that at the time of the accident, he was a state trooper and had been instructed by the district attorney to examine the Harp Street crossing to assess whether it could be made safer. McGrew was accepted as an expert in accident reconstruction. McGrew stated that the conductor told him the train's speed was 55 mph, or 81 feet per second, as it approached the crossing. McGrew testified that because of the curve in the railway track south of the crossing and the stationary boxcars on the spur track to the side of the main track, the approaching train would not have been visible to decedent as she turned left from Highway 165 onto Harp Street. McGrew opined that *155 this crossing was dangerous due to the lack of adequate signals and the excessive speed of the train for that location. He stated that the presence of boxcars on the spur track combined with the curving main track limited a driver's view. McGrew also opined that if signal lights had been installed, or if decedent had stopped at the stop sign, then the accident would not have occurred.
Duaine Evans, a registered engineer and former employee of the state highway department, was accepted as an expert in accident reconstruction and traffic planning. Evans testified that with boxcars on the spur track, he measured a sight distance of 1,000 feet from the stop sign at the crossing looking south along the main track. He stated that this did not meet the "Railroad Crossing Handbook" recommendation of a 1,400 foot sight distance for the 60-mph track involved in this situation.
Evans testified that in evaluating a crossing, a traffic engineer must consider the "human element," which involves a driver's perception and reaction time. Evans stated that the more complicated the surroundings, the longer the driver's reaction time. In this situation, Evans surmised that when the decedent approached the crossing and looked to her left, given the curving track she may only have seen the boxcars on the spur track and not have perceived the approaching train. Evans opined that at the time of the accident this crossing was particularly hazardous due to the lack of adequate warning devices, the limited sight distance resulting from the curve of the track and the speed of the train.
The defendant presented the testimony of William Shrewsberry, Jr., DOTD's administrator of the FRSP, which provides federal funds for state projects to improve the safety of public railway crossings. Shrewsberry testified that DOTD evaluates crossings and sets priorities for the distribution of limited federal funds. He explained that if the crossing is not on a state highway, DOTD must get a commitment from the local governing authority, reach agreement with the railroad and obtain authorization from the federal agency. Shrewsberry testified that even when all the Requirements have been completed, DOTD has discretion not to request federal funding for a particular project based on its ongoing evaluation of public crossings. Shrewsberry acknowledged that the letter to the mayor stated that DOTD "plans to signalize the railroad crossing" and that upon receipt of the Village's agreement to maintain the pavement markings and warning signs, DOTD would "proceed with the necessary steps to obtain approval from FHWA to complete the project." Shrewsberry testified that the Harp Street crossing had not been signalized in part because the FHWA required DOTD to re-evaluate all of the safety projects under consideration.
Brenda Woodard testified that she was working at the gas station across the street from the Harp Street crossing. Woodard stated that while she was looking out of the window she heard the train's horn blowing, saw decedent's automobile driving on Harp Street and then watched the train hit the vehicle. Woodard did not recall if there were boxcars on the spur track at the time.
Charles Cook testified that on the day of the accident, he was sitting in his truck approximately fifty yards from the Harp Street crossing. Cook stated that he saw decedent's automobile approach the crossing and that she did not stop at the stop sign before entering onto the tracks. However, Cook testified that he did not see any boxcars on the spur track.
*156 The DOTD contends it did not have custody of the Harp Street crossing. Despite DOTD's contention, the jury could have reasonably found that DOTD exercised custody and control over the crossing by expressing its intent to seek federal approval for installation of the warning devices and asking for a maintenance commitment from the mayor in the September 6, 1995 letter.
The evidence shows that at the time of the accident, the only signs present as decedent approached the crossing were a railroad crossbuck sign and a leaning stop sign placed off to the side of the shoulder of Harp Street. The plaintiffs produced expert testimony that the characteristics of the crossing, including the curving track, the lack of additional warning devices and the regular presence of boxcars on the spur track, created an unreasonable risk of harm by limiting a driver's ability to perceive an oncoming train when approaching the railway tracks.
Additionally, the testimony presented supports a finding that DOTD received knowledge of the crossing's defect through the communication of Mayor Lytle and the prior visit to the site by a DOTD employee. Further, DOTD acknowledged its awareness that additional warning devices were required by its decision to implement the process for upgrading the crossing. Both McGrew and Evans opined that the accident would not have occurred if adequate warning devices had been installed at the crossing. Thus, the jury could have found that DOTD's failure to complete the crossing upgrade was a cause of Long's death.
The jury heard the testimony and weighed the credibility of the witnesses. The jury was able to evaluate the duties of the decedent and DOTD with respect to the railway crossing and their relative capacities to act so as to avoid this accident. After reviewing the entire record, we cannot say the jury's allocation of fault was manifestly erroneous. Therefore, we will not disturb the result. The assignment of error lacks merit.
Damages
The defendant contends the jury's award of $250,000 for the survival action was excessive. Defendant argues that the award should be reduced because the plaintiffs did not produce expert testimony that decedent was consciously aware of her pain before death.
The survival action includes recovery of damages for mental or physical pain and suffering and other damages sustained by the decedent up to the moment of death. McGrail v. Lee, 35,756 (La. App.2d Cir.4/3/02), 814 So.2d 729. Damages for pain and suffering are properly awarded if there is a scintilla of evidence of any suffering or pain on the part of the deceased by his or her actions or otherwise. McGrail v. Lee, supra.
An appellate court may disturb an award of damages only when the record clearly shows that the factfinder abused its broad discretion in making the award. After a determination that an award constitutes an abuse of discretion based on the particular injuries sustained and their effect on the particular injured person, the appellate court may reduce or increase the award to the highest or lowest amount reasonably within the factfinder's discretion. Wilson v. Nat'l Union Fire Ins. Co., 27,702 (La.App.2d Cir.12/6/95), 665 So.2d 1252.
In the present case, Darrel Johnson testified that he was in the gas station across from the Harp Street crossing when he heard the sound of the train's collision with the automobile. Johnson stated that he went to the scene and observed decedent *157 lying on the ground. Johnson testified that he knelt beside the decedent, saw that she was alive and tried to give her comfort. Johnson stated that when he called decedent's name, she tried to respond by making gurgling sounds. He testified that in response to his questions, the decedent's body tensed and she appeared to try to speak, but could not form words. Johnson testified that decedent experienced difficulty breathing and that her body was "mangled" with apparent severe fractures of her arms and legs. Johnson estimated that the decedent lived for approximately 20 to 30 minutes after the impact.
Based on the testimony and the photographs depicting the extensive damage caused to decedent's vehicle, there was evidence from which the jury could find that the decedent was conscious for a period of time following the collision and that she experienced pain and suffered prior to losing consciousness. Consequently, we cannot say that the award of $250,000 in survival damages was an abuse of the jury's broad discretion. The assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed to the appellant, Louisiana Department of Transportation and Development, to the extent allowed by law.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, GASKINS, PEATROSS, and DREW, JJ.
Rehearing denied.